## STATE OF CONNECTICUT *v.* SCOTT BRIAN WOLFF
## (15279)

Peters, C. J., and Callahan, Borden, Berdon and Palmer, Js.

Argued February 15—officially released July 9, 1996

*Paul J. Ferencek*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *David J. Sheldon* and *William Bumpus*, former assistant state's attorneys, for the appellant (state).

*Suzanne Zitser*, assistant public defender, for the appellee (defendant).

BORDEN, J. The principal issue in this certified appeal is whether the Appellate Court properly concluded that the defendant was entitled to a new trial because the trial court had failed to comply adequately with Practice Book § 961 (3)[1] and, accordingly, that the

---

[1] Practice Book § 961 provides: "[Right to Counsel]—Waiver

"A defendant shall be permitted to waive his right to counsel and shall be permitted to represent himself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself;

defendant's waiver of counsel was invalid. The defendant, Scott Brian Wolff, was convicted after a jury trial of two counts of assault of a peace officer in violation of General Statutes § 53a-167c (a) (1),[2] and one count of breach of the peace in violation of General Statutes § 53a-181 (a) (5).[3] He appealed from the judgment of conviction to the Appellate Court, which reversed the judgment of the trial court and remanded the case for a new trial. *State* v. *Wolff*, 37 Conn. App. 500, 657 A.2d 650 (1995). We granted the state's petition for certification to appeal, limited to the question of whether the Appellate Court correctly concluded that the trial court had failed to conduct an adequate canvass before permitting the defendant to proceed to trial without counsel.[4] Thereafter, the defendant presented for review, pursuant to Practice Book § 4140,[5] the following alter-

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

[2] General Statutes § 53a-167c provides in relevant part: "Assault of a peace officer . . . . (a) A person is guilty of assault of a peace officer . . . when, with intent to prevent a reasonably identifiable peace officer . . . from performing his duty, and while such peace officer . . . is acting in the performance of his duties, (1) he causes physical injury to such peace officer . . . ."

[3] General Statutes § 53a-181 provides in relevant part: "Breach of the peace: Class B misdemeanor. (a) A person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . (5) in a public place, uses abusive or obscene language or makes an obscene gesture . . . ."

[4] The specific question certified was: "In the circumstances of this case, did the Appellate Court properly conclude that the trial court did not conduct an adequate canvass before permitting the defendant to waive counsel?" *State* v. *Wolff*, 234 Conn. 901, 660 A.2d 859 (1995).

[5] Practice Book § 4140 provides in pertinent part: "[Proceedings after Certification by Supreme Court]—Papers to be Filed by Appellant and Appellee

"(a) Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . ."

nate grounds for affirming the judgment of the Appellate Court: (1) the trial court improperly permitted the defendant to represent himself without ordering, sua sponte, an examination to determine whether he was competent to do so; and (2) the trial court improperly instructed the jury regarding the element of intent required for conviction of the breach of the peace charge. We reverse the judgment of the Appellate Court with respect to the validity of the defendant's waiver, and affirm its judgment with respect to the jury instruction regarding the breach of the peace charge.

The jury could reasonably have found the following facts. On May 26, 1992, while Hartford police officer Stephen Miele was on foot patrol near the train station in downtown Hartford, he stopped an individual who fit the description of a robbery suspect being sought by the police. Because the suspect was uncooperative, Miele requested assistance and was soon joined by police officer Laura Buyak. While Miele was in the process of arresting the robbery suspect, his attention was diverted to the defendant, who was standing at the top of the train station stairway shouting something approximating the following: "Fuck you, you motherfucking cops. You're all cocksuckers. You're all out to get me." The defendant was also screaming such things as "[f]ucking cops," causing other people to stop and see what was occurring. Dennis Connolly, who was working in a store across the street from the train station, heard a commotion outside and, when he went to investigate, saw the defendant standing at the top of the stairs, shouting at Miele and Buyak, using the language previously described. Connolly was annoyed and alarmed by the defendant's language.

After placing the robbery suspect in Buyak's patrol car, Miele and Buyak approached the defendant and attempted to calm him down. Because Miele thought that the defendant might have been a friend of the

man arrested, he approached the defendant in order to explain why the other man had been arrested. As Miele was trying to speak to the defendant and calm him down, the defendant swung at Miele, striking him in the chest. When Buyak attempted to assist Miele, the defendant became even more agitated and began swinging his arms and fists at both officers, who tried to defend themselves and to restrain the defendant. During the ensuing struggle, the defendant and the two officers fell down several steps of the stairway, resulting in loss of consciousness to Buyak, and an injury to Miele's foot. When Buyak regained consciousness, the defendant was on the ground, still struggling with Miele. Buyak then picked up Miele's baton and struck the defendant in the legs until he was sufficiently subdued to permit the officers to handcuff him. The defendant was then taken to the police station in a patrol wagon, and both officers were treated at a hospital for their injuries.

At the defendant's arraignment on May 27, 1992, the court, *Pellegrino, J.*, proposed to appoint the public defender to represent the defendant. The defendant informed the court, however, that he intended to represent himself. At his next two pretrial appearances, on June 10, 1992,[6] and June 24, 1992, before *Pellegrino, J.*, and *Kocay, J.*, respectively, the defendant appeared without counsel and reiterated his desire to proceed pro se. At the defendant's next appearance, on July 7, 1992, the court, *Kocay, J.*, informed the defendant that, despite the defendant's objections, it was going to appoint the public defender to represent him. Judge Kocay told the defendant: "[i]f you don't want the public defender then he can sit behind you when the case comes up. But I'm going to continue this so they can

---

[6] Ordinarily, the defendant would have been put to plea on the charges. For reasons that the record does not disclose, at the June 10, 1992 hearing, Judge Pellegrino entered not guilty pleas and elected a jury trial on behalf of the defendant.

discuss it with you to determine if a public defender is appropriate. . . . *At this stage I'm going to appoint the public defender to assist you. You can refuse his services if you wish but he's going to be appointed notwithstanding.*" (Emphasis added.) Although the defendant had initially objected to the appointment of the public defender stating, "No, that's my choice," by the end of the July 7 hearing he had learned that the public defender might be able to help him get access to his supplemental security income (SSI) checks, at which point he inquired when he would be able to talk to the public defender.

On July 21, 1992, assistant public defender Ross Delaney appeared before Judge Kocay on behalf of the defendant and requested a continuance to confer with the defendant, which the court permitted. The following day, Delaney again appeared for the defendant and argued a motion for bond reduction before Judge Kocay. When asked if he was the defendant's attorney of record, Delaney responded that he was. Delaney also stated, however, that he was acting as standby counsel. During the bond reduction hearing, the state recounted the facts of the case, maintaining that the defendant had been screaming and swearing at police officers, and then had engaged in a fight with them. Delaney then said that he had discussed the case with the defendant, who had presented a different version of the incident.[7]

---

[7] At the July 22, 1992 hearing, the bail commissioner appeared and summarized the defendant's legal history and noted that, in addition to the charges in this case, the defendant also had outstanding charges in a similar, but unrelated incident that had occurred on December, 20, 1991. The bail commissioner reminded the court that, at the defendant's arraignment, he had recommended a promise to appear, and was reinstituting that recommendation "on the assault on [a] police officer file." The court was reluctant to release the defendant on a promise to appear and requested that Delaney, as the defendant's attorney of record, assist the defendant in obtaining his social security disability checks in order to post bond. The defendant complained that Delaney had not contacted him as had been promised

At the next pretrial hearing, on September 15, 1992, Delaney again appeared for the defendant and addressed the court, *O'Keefe, J.*, on the defendant's behalf. The defendant renewed his objection to being represented by Delaney, insisting that he had been pro se all along, but also stating that when Judge Kocay had appointed Delaney, he had "[gone] along with it." The court then allowed the defendant individually to present argument about his bond.[8]

At the defendant's next appearance, on November 18, 1992, the court, *Espinosa, J.*, informed the defendant that his case was ready for trial and asked the defendant if he had counsel. After the defendant told Judge Espinosa that he intended to represent himself, she questioned him in order to determine whether to accept his waiver of counsel.[9] Thereafter, the trial court

previously and, therefore, that he had been unable to post bond and work on his defense. The defendant specifically referred to the December 20, 1991 incident and clearly knew the difference between that case and the May 26, 1992 case. The state opposed any reduction in bail, arguing that "[both] cases involve unprovoked attacks on police officers. In one situation the officers were arresting another party for a robbery. This party approached the officer[s], screaming and yelling at them, swearing at them in words that I've yet to hear myself. A fight took place. One officer was knocked unconscious. And another officer was on top of this party and was trying to subdue him. Obviously he's a threat and I believe he should remain incarcerated at least for the general citizenry of the city of Hartford." Delaney then indicated that he had discussed the facts of the case with the defendant, who had stated that he had not been yelling at the police and that it was the police who had approached him and had started the incident.

[8] The defendant was thereafter escorted from the courtroom when an issue of his competency arose. The defendant had complained that Delaney had not "posted bond for him." Judge O'Keefe, finding the idea that Delaney would post bond for a client "a wild, bizarre idea," ordered a competency examination. Delaney and the state then explained that, because Delaney had gone to the federal building to pick up the defendant's SSI check, which the defendant intended to use to post bond, the defendant's complaint that Delaney had not "posted bond" for him simply referred to Delaney's trip to the federal building on the defendant's behalf, and the court then withdrew the order for a competency examination.

[9] The trial court's canvass of the defendant consisted of the following colloquy:

told the defendant that he would be permitted to repre-
sent himself at trial, with Delaney acting as standby
counsel.

"The Court: All right, bring him in. All right, Mr. Wolff, Scott Brian Wolff,
is that your name?

"The Defendant: Yes, ma'am.

"The Court: All right, now your case is ready for trial, one of the cases
has been pending since December, 1991. And do you have a lawyer?

"The Defendant: Well, I'm pro se.

"The Court: All right, and since when have you been pro se?

"The Defendant: All along.

"The Court: And do you—you had a public defender appointed, is that
correct?

"The Defendant: You might say so, yeah.

"The Court: All right, and you don't want hi[s] assistance?

"The Defendant: That's correct.

"The Court: All right, and why not?

"The Defendant: Because I can present the case better than he can.

"The Court: All right, let me ask you then in that regard, do you know
anything about the rules of evidence?

"The Defendant: Yeah.

"The Court: You do?

"The Defendant: Yeah.

"The Court: And where did you get your training?

"The Defendant: The street.

"The Court: The street? All right.

"The Defendant: And I have a couple of years in college.

"The Court: All right, and you—

"The Defendant: If I may say something? On the case that you're talking
of, you're—which case are you talking of?

"The Court: Well, there are two of them.

"The Defendant: Yeah.

"The Court: You have one that was December, 1991, and one which was
May, 1992.

"The Defendant: That's right. Now, the case in 1991, I was expecting
to go to trial July 3 and on that case I had probably about three or four
pretrials. Now on this second case I've had four or five pretrials. Now I
hope that you are—have more information about this case than I'm hearing.
I mean . . .

"The Court: I don't have any information about this case because I am
the trial judge. I'm not—I don't get involved in pretrials, I know absolutely
nothing about your case and that will remain that way because you're going
to get a jury trial.

"The Defendant: Okay, then, well, if I may enlighten you—

After a recess, the trial court reconvened. Upon
reconvening, further colloquies and proceedings took

"The Court: Excuse me, unless you want a court trial.

"The Defendant: No, I want a jury trial. If I may enlighten you a little bit about the public defender and all of that. I asked the judge repeatedly if I could have a [promise to appear], okay, I was denied that, okay. And the court appointed Mr. Delaney here, now I have a very low bond.

"The Court: What is your bond?

"The Defendant: Two thousand, now Mr. Delaney here one day asked for a [promise to appear], I had a bond reduction and he says I'm going to go get your social security check. Now he went through the trouble of getting me the social security check and I never heard from—I got two social security checks which would pay for the bond okay. And that was months ago.

"The Court: What kind of—are you on disability of some sort? What kind of social security?

"The Defendant: No, SSI.

"The Court: SSI?

"The Defendant: Right.

"The Court: Uh hum.

"The Defendant: No it's beyond me how I'm supposed to—how you expect me to be part of this—Mr. Delaney here when I mean he wouldn't even post my bond.

"The Court: Well he can't post your bond. A lawyer cannot post bond for a client. That's against the canons of the ethics, he can't do that. Don't you have any family? Anybody?

"The Defendant: Oh, family is the only one that can post bond?

"The Court: Anybody but a lawyer. He is forbidden from posting bond for a client. That's not his job and as I said he would be in violation of the canons of ethics.

"The Defendant: Well, he told me this, that he was going to contact a couple of bondsmen and they were going to contact me, all right.

"The Court: That's proper.

"The Defendant: Now nothing ever happened.

"The Court: Well, are you blaming him for that?

"The Defendant: Yeah, I am.

"The Court: Well, that's not his job. His job is to represent you in legal matters. As I said you don't have—

"The Defendant: That's not a legal matter, as far as getting—

"The Court: You don't have any family that can bring the—

"The Defendant: No I have no family.

"The Court: No friends?

"The Defendant: No.

"The Court: Nobody? Where did you live before you were arrested?

"The Defendant: I was living at South Park Inn.

"The Court: Well that issue, the bond issue?

place among the trial court, the state, the defendant and his standby counsel. The court explained the process of

"The Defendant: Yeah?

"The Court: Is not why you're here today.

"The Defendant: Right, okay.

"The Court: You're here because we're going to go to trial.

"The Defendant: Right, right, now I'm prepared to go to trial.

"The Court: All right.

"The Defendant: Now number one I've been pro se as I say all along on both cases. I accepted the court's judgment in appointing this public defender here, okay? And that was no problem but I was continuously denied a promise to appear which I can find no reason why that's denied me. My bond was . . .

"The Court: As I said that's not—I'm not here to decide your bond.

"The Defendant: Okay.

"The Court: I am the trial judge.

"The Defendant: Yeah, yeah.

"The Court: That's why we're here, for the trial.

"The Defendant: Okay, now the court is expecting me to go to trial when I've said all along that I'm pro se and I'd like to present my case. I told the court that I'd like to go out on the street—outside okay, I'm in jail now, so I can start putting together my defense. Now, it's beyond me how the court expects me to start my trial when I haven't been able to prepare for it.

"The Court: Uh hum, what have you been [doing] since you've been sitting in jail? Have you been going to the law library to research the issues in your case?

"The Defendant: I am not—I am—I've already been through one trial ma'am. Okay, so I am somewhat familiar [with] what a trial consists of.

"The Court: All right. Let me, let's get one thing straight here, you have a right to defend yourself, but the court has to determine first and put on the record that you know what you're doing, that's all. If you want to [go to] trial and defend yourself then that's fine.

"The Defendant: Yeah, well if the court says that I'm incompetent, then so be it. But I mean—

"The Court: I'm not going to say that unless—

"The Defendant: Well they must've decided that I am competent, but they're stonewalling me because I cannot go out and prepare my defense. I mean I can't prepare my defense in jail.

"The Court: Why not?

"The Defendant: Because I need to subpoena people, I need to gather infor—you know talk to people about this and that. I mean that's only fair.

"The Court: Well, unfortunately you are in custody and you have to defend yourself. If you want you have available to you a lawyer, but you don't want the lawyer you want to do it on your own. That is your right as long as you know what you're doing and you know the consequences of what you're doing.

jury voir dire to the defendant, and he indicated that he understood the court's explanation. The court then

"The Defendant: Well my consequences is I lose the case.

"The Court: Right, do you understand how much time you're facing in jail?

"The Defendant: He told me last, two consecutive ten year bids.

"The Court: All right and that—

"The Defendant: Is that correct?

"The Court: Well is that right? What's assault on an officer, five?

"Mr. Delaney: C felony.

"[William Bumpus, Assistant State's Attorney]: C, it's ten, Your Honor.

"The Court: Ten. Ten years, you have two counts of assault on an officer, that is twenty and then you have on the other one two, two and a half years.

"The Defendant: Okay so now you're telling me—I mean I'm aware of the consequences but I mean I see it as being highly unfair that you expect me to go to trial like that without being able to prepare my defense.

"The Court: Well, if what you're saying is that the only way you can prepare your defense is by being out on the street that's not correct. Many people prepare their own defenses and defend themselves when they're in custody.

"The Defendant: Yeah, oh yeah, there's no doubt about that, I agree with you on that, but I mean is it that too much to ask for a promise to appear?

"The Court: That's not what you're—

"The Defendant: You're saying I already had a bond reduction, this and that and on my last court appearance, okay, he was ready to give me a trial then, okay. And he never, the judge never gave me my next court date, okay. I mean there's all sorts of you know violations. Now if the only way we can get this over with is for me to start today then so be it, but I mean it's very unprofessional, I say, it's—you're going to make me look very unprofessional.

"The Court: Well, that's one of the dangers of representing yourself when you don't know what you're doing and you're not a lawyer.

"The Defendant: No but you're telling me I don't know what, how to prepare a defense.

"The Court: No I'm not saying that, you may know, I don't know. I haven't seen you in the courtroom, I haven't seen whatever it is you want to do. My purpose here is to explain to you the consequences of you representing yourself. And the consequences are these, that you're going to be facing an experienced lawyer who knows the rules of evidence and procedure. Who knows how to question witnesses and cross-examine, who has had many years experience, legal training and you have none. Now if you want to represent yourself knowing the consequences that you're facing twenty years in prison, if you get convicted, that's your right. As long as we understand the consequences of your actions, that's the only reason we're here. You have, every citizen has a right to defend and represent themselves, and you have that right like anybody else. If what you're trying to do is tell me that the

explained that it would be in the defendant's interest
to have the two sets of charges severed so as to avoid

only way you can defend yourself is by getting out in the street then I told you that is not the purpose we're here. Some judge has decided that the proper amount of the bond is what has been set. That's that judge's decision.

"The Defendant: Ma'am, okay, we can start the trial, but I want to say this. Having four or five pretrials on one case is too much, okay? Number one the case in 1991 was expected to—I was on the pretrial docket on three different occasions for that case. Now that's wrong in itself, okay?

"The Court: All right, you wanted a trial sooner, is that it?

"The Defendant: Of course I wanted a trial sooner.

"The Court: All right. Then that's fine, we'll proceed.

"The Defendant: That didn't happen. Now all of this and I'm not granted a promise to appear. You know what that says to me? That says that you people are being very unfair, but like I say there's no problem with starting a trial, but—

"The Court: All right, we'll do that, which case are we starting on then? Both together or—

"The Defendant: You don't know which case—you see, you know that's your decision.

"The Court: Well, that's not my decision, that's the state's.

"Mr. Bumpus: Yes, Your Honor, the state would be requesting to try both matters together.

"The Court: All right, and what's your position on that?

"The Defendant: That's not a problem.

"The Court: You want to try both of them at the same time?

"The Defendant: We've already been through that, yeah. The—one of the previous judges said that having both cases would save the state money.

"The Court: All right. For the record then I want to just question you to make sure that it's clear about the fact that you're representing yourself. You have a public defender assigned to you, I'm going to ask Mr. Delaney to remain as standby counsel. What that means is that if you want to speak to him, if a legal issue comes up that you want to talk to him about it, then you may do so.

"The Defendant: I'd like another—someone else beside Mr. Delaney because I've been given false information by him, that's why.

"The Court: Well Mr. Delaney is familiar—

"Mr. Delaney: You better put it on the record if you want to have something to do about that, you better tell the judge what false information you got.

"The Court: Mr. Delaney is the one that's familiar with the case.

"The Defendant: Yeah?

"The Court: And so he knows what your situation is.

"The Defendant: Uh hum.

"The Court: Now you don't want him because he gave you false information?

undue prejudice to him. See footnotes 7 and 10. In this connection, Delaney also indicated that he had advised

"The Defendant: Okay, you can answer this question. How long has the state got to go to trial?

"The Court: Did you file a motion for a speedy trial?

"The Defendant: I'm talking without a motion for a speedy trial.

"The Court: Years.

"The Defendant: Years?

"The Court: Uh hum.

"The Defendant: Okay, Mr. Delaney can represent me.

"The Court: Okay, he's—you mean to represent you or to be standby counsel?

"The Defendant: No I mean he can standby, whatever you want to call it.

"The Court: Standby counsel?

"The Defendant: Standby counsel, yeah.

"The Court: All right he will be here to assist you if you want to ask him questions.

"The Defendant: Yeah right.

"The Court: About the law or a procedure, all right?

"The Defendant: Right, yeah.

"The Court: So you understand as I said before, do you? That—well let me ask you this, you said you had two years of college?

"The Defendant: Two and a half.

"The Court: Two, where did you go to school?

"The Defendant: North Texas State University.

"The Court: And what did you study?

"The Defendant: Business.

"The Court: Business administration or what?

"The Defendant: I was majoring in marketing.

"The Court: All right, and when was that?

"The Defendant: Seventy-nine, eighty, eighty-one.

"The Court: When did you graduate from high school?

"The Defendant: Seventy-nine.

"The Court: Where?

"The Defendant: Hall High School.

"The Court: In West Hartford?

"The Defendant: Yeah.

"The Court: Excuse me?

"The Defendant: Yes.

"The Court: All right, and what did you do after high school?

"The Defendant: I went to college.

"The Court: You went to—and what did you do after college?

"The Defendant: Is this—

"Mr. Delaney: The judge needs to ask you some questions to find out if you can represent yourself. She's trying to find out your qualifications.

the defendant of the "legal ramifications" of having the
cases tried separately or together, and that "it was [the

"The Defendant: Oh, she's seeing whether I'm competent?

"Mr. Delaney: Not—well, whether you're able to defend, take care of
yourself.

"The Defendant: Damn, I been—nineteen ninety-one was when I was first
arrested and I've been all along, maybe I went crazy along the way. Okay
after college I decided to drop out and I got a job as an auto mechanic.

"The Court: All right, have you ever served in the military?

"The Defendant: Never.

"The Court: All right and did—you said you're getting SSI, that's disability,
what's that for?

"The Defendant: That's for a previous breakdown you might want to call
it, a couple of mental—

"The Court: Some kind of emotional problem?

"The Defendant: That's right.

"The Court: All right, and do you receive—do you take any medication
now?

"The Defendant: No.

"The Court: And when was—you don't have—you're not under treatment
for that?

"The Defendant: No.

"The Court: All right and you said that before you were arrested you were
living at a shelter?

"The Defendant: I was living in a transitional living facility.

"The Court: You had just gotten out of jail? Were you in jail and they put
you in a facility?

"The Defendant: I was arrested in ninety-one, okay? So no I wasn't in jail.

"The Court: Uh hum, you were at that facility as a result of that arrest?

"The Defendant: As a result—that facility is not—that's out on the street.

"The Court: Okay, that's what I'm trying to determine, where did you live?
I don't know where it is.

"The Defendant: Like I say, transitional living facility, South Park Inn.

"The Court: Okay, all right and so you've had two years of college, two
and a half years of college. Do you feel qualified to represent yourself?

"The Defendant: Ma'am, I wouldn't be standing here if I felt otherwise.

"The Court: Listen to me, you answer my questions in a respectful fashion
or you're going to be sitting in the cell in contempt. Now I'm trying to give
you some leeway because you're not a lawyer. But I'm not going to take
any lip from you, do you understand that?

"The Defendant: Yes ma'am.

"The Court: Now you answer my questions in the appropriate manner.
You want to represent yourself, well you're in a court of law and you will
act respectfully or we're going to have a lot of problems. Now I have to
ask you these questions for the record, you want to represent yourself,

defendant's] decision to state whatever he [wanted]."
When the state objected to a severance, the state, at
the court's request, described the facts of the two sets
of charges, and the defendant elected to have them
tried together.[10] The court then explained to the defend-

---

that's fine but I am going to make sure that this record reflects that you
know what you're doing and that's the purpose for these questions. Now
do you feel that you can represent yourself, yes or no?

"The Defendant: Yes.

"The Court: And you understand the consequences of your, representing yourself?

"The Defendant: Yes.

"The Court: All right, we've already been through that, the fact that you
can go to jail for twenty years, correct?

"The Defendant: Yes.

"The Court: All right. All right knowing that you know the consequences,
you know what you're doing, the court is going to let you represent yourself.
And I'm telling you the rules, if you're going to represent yourself you're
going to act like, as much like a lawyer as you can. Because that's your
function here and this isn't going to be a circus and you're going to do
things in a respectful fashion. If you need to consult with Mr. Delaney he's
here for you to do that. Now the first thing that we're going to do is we're
going to pick the jury. Do we have a panel? We'll take a recess then, and
take a recess we're going to call [the] panel. We'll recess until noon, at that
time the panel will be here and we'll start picking the jury. Court's in recess."

[10] The state's explanation of the two sets of charges and the defendant's
decision to try the cases together consisted of the following exchange:

"The Court: All right, well tell me what the facts are of the first case, the
breach of peace?

"[William Bumpus, Assistant State's Attorney]: The first case I will refer
to the report, Your Honor. Your Honor the facts per the police report to
the first case in terms of time are that on December 20, 1991, in the area
of one Civic Center police officer by the name Al DeStefano was on patrol,
he passed by the defendant he said hello at which time the defendant
responded by saying 'Go fuck yourself.' The officer approached the accused
who continued to swear. Officer asked the defendant to leave the Civic
Center lobby because his behavior was in violation of the law. The defendant
refused at which time the defendant then took a swing at the police officer,
he missed and the police officer placed him under arrest.

"The Court: All right, and the second one?

"Mr. Bumpus: The facts are as follows, on May 26, 1992, near one Union
Place police officer by the name of Laura Buyak was placing another individual under arrest at which time she was approached by the defendant. He
was shouting obscenities stating 'fuck you motherfucking cops, you motherfucking cops are all—.' It continues with a string of obscenities, Your

ant that the state proposed to file a substitute information that would change the charge in the December 20, 1991 incident from a misdemeanor to a felony, that the charge of "assault on a peace officer" is a class C felony carrying a minimum mandatory sentence of one year, and a maximum sentence of ten years and a $5000 fine, and that the charge of "[b]reach of the peace" carries a maximum penalty of six months and a $1000 fine. The court further explained that, because of the defendant's decision to have the cases tried together, the state had to file a substitute information, and stated: "So if that's what you want to do you'll understand the consequences of that then I will recess and give the state an opportunity to [file a substitute information] because what's going to happen is you have to plead again. You have to plead not guilty to the new charges, and ask

Honor, at which time officer Buyak approached him, told him to calm down. The defendant continued with his obscenities, at which time he was causing a crowd to gather. He continued with more obscenities when another police officer approached him. The defendant took a swing at this police officer with his clenched fist striking the police officer in the chest and a fight between officer Buyak, officer Miele and the defendant ensued Your Honor.

"The Court: All right, to respond to what the prosecutor said, Mr. Wolff, the only reason that I bring this up is so that you know that there is this avenue for you to have one case tried at a time so that there is no prejudice in any particular case. As I said what could happen is that the jury might find that because in December, 1991, you swung at a police officer, then you must've done the same thing and be guilty of what happened in May. And so, but however it is your choice if you want them together we can do that.

"The Defendant: I see the other way, as the police harassing me.

"The Court: Well, that's your defense, but I'm just talking about whether—

"The Defendant: Right, so then like I say try them together. I mean if the state wants to save money you can try them together. Everything will go faster that way.

"The Court: All right, so you understand then, what the consequences could be and you're willing to take that risk?

"The Defendant: Yes.

"The Court: Okay."

The state subsequently withdrew the charges in the December 20, 1991 incident, and the defendant was tried solely on the charges in the May 26, 1992 incident.

for a jury trial." Before the court recessed, however, the defendant requested copies of the police reports on the two cases. Delaney indicated that he had those copies, and would give them to the defendant.

After the luncheon recess, the state handed copies of its two long form substitute informations to the defendant, and the defendant was put to plea on the charges involved in this appeal. The clerk read the long form information involved in this case, which spelled out the statutory elements of the charges of assault of a peace officer and breach of the peace.[11] The court then, at the state's request, readvised the defendant of the penalties for assault of a peace officer and breach of the peace, and the court again asked the defendant whether he had "ever represented [him]self before in a case," to which the defendant responded, "No." Thereafter, the parties selected a jury, and the trial proceeded.

At trial, the defendant represented himself, with Delaney acting as standby counsel. The jury found the

---

[11] The charges read by the court clerk were as follows:

"The Clerk: [I]n docket number CR92-42 42 99 to the substituted information pursuant to Practice Book §§ 618, 832 and 833, the state of Connecticut alleges that on or about May 26, 1992, approximately 5:05 p.m. at or near one Union Place in the city of Hartford, the defendant, Scott Brian Wolff, count one, caused physical injury to a peace officer, to wit officer Laura Buyak while she was acting in performance of her duties as a peace officer in violation of Connecticut General Statutes § 53a-167c, assault of a police officer. How do you plead to this charge, guilty or not guilty?

"The Defendant: Not guilty.

"The Clerk: On count two caused physical injury to a peace officer, to wit officer Steven Miele while he was acting in performance of his duties as a peace officer in violation of Connecticut General Statutes § 53a-167c, assault of a police officer. How do you plead to this charge guilty or not guilty?

"The Defendant: Not guilty.

"The Clerk: And on count three, did with intent to cause inconvenience, annoyance or alarm, he in a public place used abusive or offensive language in violation of Connecticut General Statutes § 53a-181 (a) (5), breach of [the] peace. How do you plead to this charge, guilty or not guilty?

"The Defendant: Not guilty."

defendant guilty of all three charges and, after the court ordered the defendant examined pursuant to General Statutes § 17a-566,[12] the court rendered judgment of conviction in accordance with the verdict.

The defendant appealed to the Appellate Court. In the Appellate Court, the defendant claimed that "the

In order to conform to § 53a-181 (a) (5), the state subsequently changed "offensive" to "obscene" in the third count.

[12] General Statutes § 17a-566 provides: "Certain convicted persons to be examined. Report and recommendation. (a) Except as provided in section 17a-574 any court prior to sentencing a person convicted of an offense for which the penalty may be imprisonment in the Connecticut Correctional Institution at Somers, or of a sex offense involving (1) physical force or violence, (2) disparity of age between an adult and a minor or (3) a sexual act of a compulsive or repetitive nature, may if it appears to the court that such person is mentally ill and dangerous to himself or others, upon its own motion or upon request of any of the persons enumerated in subsection (b) of this section and a subsequent finding that such request is justified, order the commissioner [of mental health] to conduct an examination of the convicted defendant by qualified personnel of the institute. Upon completion of such examination the examiner shall report in writing to the court. Such report shall indicate whether the convicted defendant should be committed to the diagnostic unit of the [Whiting Forensic Institute] for additional examination or should be sentenced in accordance with the conviction. Such examination shall be conducted and the report made to the court not later than fifteen days after the order for the examination. Such examination may be conducted at a correctional facility if the defendant is confined or it may be conducted on an outpatient basis at the institute or other appropriate location. If the report recommends additional examination at the diagnostic unit, the court may, after a hearing, order the convicted defendant committed to the diagnostic unit of the institute for a period not to exceed sixty days, except as provided in section 17a-567 provided the hearing may be waived by the defendant. Such commitment shall not be effective until the director certifies to the court that space is available at the diagnostic unit. While confined in said diagnostic unit, the defendant shall be given a complete physical and psychiatric examination by the staff of the unit and may receive medication and treatment without his consent. The director shall have authority to procure all court records, institutional records and probation or other reports which provide information about the defendant.

"(b) The request for such examination may be made by the state's attorney or assistant state's attorney who prosecuted the defendant for an offense specified in this section, or by the defendant or his attorney in his behalf. If the court orders such examination, a copy of the examination order shall be served upon the defendant to be examined.

trial court improperly (1) permitted him to represent himself without a determination that he was competent, (2) permitted him to proceed without an adequate waiver of counsel, (3) determined that sufficient evidence was introduced at trial from which a rational trier of fact could find the defendant guilty of breach of the peace, and (4) instructed the jury on the intent element of breach of the peace." *State* v. *Wolff*, supra, 37 Conn. App. 501–502. The Appellate Court rejected the defendant's third claim, and did not reach the first and fourth claims. With respect to the defendant's waiver of counsel claim, the court concluded that, when the trial court had canvassed the defendant in order to determine whether to accept his waiver, it had failed to comply with Practice Book § 961 (3), which requires that, in order for a defendant to waive his right to counsel and represent himself, the court must be satisfied that he "[c]omprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case." See footnote 1.

The Appellate Court considered the defendant's claim under § 961 (3) pursuant to the plain error doctrine;

"(c) Upon completion of the physical and psychiatric examination of the defendant, but not later than sixty days after admission to the diagnostic unit, a written report of the results thereof shall be filed in quadruplicate with the clerk of the court before which he was convicted, and such clerk shall cause copies to be delivered to the state's attorney, to counsel for the defendant and to the Office of Adult Probation.

"(d) Such report shall include the following: (1) A description of the nature of the examination; (2) a diagnosis of the mental condition of the defendant; (3) an opinion as to whether the diagnosis and prognosis demonstrate clearly that the defendant is actually dangerous to himself or others and requires custody, care and treatment at the institute; and (4) a recommendation as to whether the defendant should be sentenced in accordance with the conviction, sentenced in accordance with the conviction and confined in the institute for custody, care and treatment, placed on probation by the court or placed on probation by the court with the requirement, as a condition to probation, that he receive outpatient psychiatric treatment."

see Practice Book § 4185;[13] concluding that, "[a]lthough the defendant did not properly preserve this claim of error for appeal, noncompliance with a mandatory rule of practice constitutes plain error." *State* v. *Wolff*, supra, 37 Conn. App. 506. The court also noted that "[t]his claim is also reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Because we conclude that the trial court's actions constituted plain error, we need not undertake a *Golding* analysis." *State* v. *Wolff*, supra, 506 n.6.

The Appellate Court concluded that the trial court's canvass of the defendant was flawed because the court had not advised him of the specific statutory elements of the crimes charged. Id., 506. "In an attempt to comply with § 961 (3), the court did advise the defendant of the penalties that he faced in light of the state's charges, but it did not advise him of the elements of those crimes so as to inform him adequately of the nature of the charges against him." Id. In response to the state's argument that the trial court was entitled to presume that the defendant's counsel had explained to him the nature of the offenses in sufficient detail, the Appellate Court read the record to disclose that "the defendant proceeded without the assistance of counsel from the inception of his court appearances. We cannot presume, therefore, that the defendant's attorney had explained the nature of the offenses to the defendant." Id., 507. The court concluded, accordingly, that there had been " 'substantial defective compliance' " with § 961 (3). Id. Accordingly, the Appellate Court reversed the judgment of conviction and remanded the case for a new trial. Id., 509. This certified appeal by the state followed.

---

[13] Practice Book § 4185 provides in pertinent part: "Errors Considered

"The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

## I

We first address the certified issue, namely, whether the Appellate Court properly concluded that the defendant's waiver of counsel and election to proceed pro se was invalid. The state claims that the Appellate Court improperly concluded that the trial court did not comply adequately with the requirements of § 961 (3). The state takes issue with the Appellate Court's decision on two grounds. First, the state argues that the Appellate Court improperly construed the provision in § 961 (3) that the defendant be advised of the nature of the charges against him to require the trial court to advise the defendant of the specific elements of the crimes with which he was being charged. Second, the state contends that the Appellate Court improperly concluded that the trial court could not presume that the defendant's counsel had advised him of the nature of the charges. The state further argues that all of the remaining requirements of § 961 had been satisfied. We agree with the state.

### A

We first consider the Appellate Court's reliance, under the plain error doctrine, on what it held to be the trial court's noncompliance with a mandatory rule of practice, namely, § 961 (3). To the extent that the Appellate Court based its conclusion on the effect of § 961 (3) solely as a mandatory rule of practice, apart from its constitutional underpinnings,[14] that basis was flawed because § 961 and the constitutional requirements for permitting a defendant to waive his right to

---

[14] Although the Appellate Court noted that the defendant's claim was "also reviewable" under *Golding*, which would have required a constitutional, rather than plain error, analysis, it also indicated that it "need not undertake a *Golding* analysis." *State* v. *Wolff*, supra, 37 Conn. App. 506 n.6. We read the Appellate Court opinion, therefore, to rest, not on constitutional principles, but on a reading of § 961 (3) that may go beyond such principles.

counsel and, thereby, assert his constitutional right to represent himself, are synonymous.

The right to counsel and the right to self-representation "present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 821, 661 A.2d 539 (1995).

Section 961 "was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . ." *State* v. *Gethers*, 193 Conn. 526, 532, 480 A.2d 435 (1984) (*Gethers I*). Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § 961, in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. *State* v. *Day*, supra, 233 Conn. 822. Because the § 961 inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § 961 cannot be construed to require *anything more than is constitutionally mandated. Id.*; *State* v. *Townsend*, 211 Conn. 215, 220, 558 A.2d 669 (1989); *Gethers I*, supra, 534.

"[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . *Faretta* v. *California*, [422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)]. Rather, a record that affirmatively shows

that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. Id.; *Gethers I*, supra, [193 Conn.] 536." (Internal quotation marks omitted.) *State* v. *Day*, supra, 233 Conn. 827–28. The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. See, e.g., *United States* v. *Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995) (court must inform defendant of charges, included offenses and possible range of punishment); *United States* v. *Hurtado*, 47 F.3d 577, 583 (2d Cir. 1995) (factors determining valid waiver include whether defendant understood that he had choice between proceeding pro se and with assigned counsel, understood advantages of having trained counsel, and had capacity to make intelligent choice); *United States* v. *Van Krieken*, 39 F.3d 227, 229 (9th Cir. 1994) (defendant must be aware of nature of charges against him, possible penalties and disadvantages of self-representation); *Government of Virgin Islands* v. *James*, 934 F.2d 468, 471 (3d Cir. 1991) (waiver must be made with apprehension of nature of charges, statutory offenses included within them, range of allowable punishments thereunder, possible defenses to charges, circumstances in mitigation thereof, and all other facts essential to broad understanding of whole matter); *United States* v. *Silkwood*, 893 F.2d 245, 249 (10th Cir. 1989) (same); *United States* v. *McDowell*, 814 F.2d 245, 251 (6th Cir. 1987) ("model inquiry" includes questioning about defendant's legal background, knowledge of crimes charged, possible punishments, familiarity with Federal Rules of Evidence and Criminal Procedure, procedure for testifying, and advice that defendant would be better served by representation by trained attorney).

None of these authorities, however, stands for the proposition that a defendant must be specifically

informed of the particular elements of the crimes charged before being permitted to waive counsel and proceed pro se.[15] In fact, the Court of Appeals for the Ninth Circuit has stated that "perfect comprehension of each element of a criminal charge does not appear to be necessary to a finding of a knowing and intelligent waiver." *United States* v. *Robinson*, 913 F.2d 712, 715 (9th Cir. 1990). A discussion of the elements of the charged crimes would be helpful, and may be one of the factors involved in the ultimate determination of whether the defendant understands the nature of the charges against him. A description of the elements of the crime is not, however, a sine qua non of the defendant's constitutional rights in this context. Indeed, in our cases we have approved of a defendant's assertion of the right to proceed pro se where the record did not affirmatively disclose that the trial court explained the specific elements of the crimes charged to the defendant as long as the defendant understood the nature of the crimes charged. See *State* v. *Day*, supra, 233 Conn. 829 (defendant aware that he was charged with capital felony and multiple counts of murder); *State* v. *Town-*

---

[15] In the context of the trial court's acceptance of a guilty plea, we have read Practice Book § 711 (1), which dictates that the trial court determine whether the defendant understands the nature of the charge to which he is entering a plea, to require that the court inform the defendant of the essential elements of the crime charged. *Oppel* v. *Lopes*, 200 Conn. 553, 558–59, 512 A.2d 888 (1986); *State* v. *Childree*, 189 Conn. 114, 120, 454 A.2d 1274 (1983). Although in this case we are called upon to interpret language identical to that which we construed in *Oppel* and *Childree*, those cases do not control our interpretation of the phrase "nature of the charges" as used in § 961 (3). By entering a guilty plea, a defendant is waiving his right to trial by jury, his right to confront accusers, and the privilege against self-incrimination; the defendant is not, however, simultaneously asserting another constitutional right. Unlike a guilty plea, waiver of the right to counsel involves reciprocal constitutional rights; the assertion of the right to self-representation compels waiver of the right to counsel. In the context of § 961 (3), therefore, we construe the phrase "nature of the charges" to mean precisely that which is constitutionally required for the assertion of these complementary constitutional rights.

*send,* supra, 211 Conn. 222 (defendant aware that he was charged with murder); *State* v. *Gethers,* 197 Conn. 369, 371 n.2, 497 A.2d 408 (1985) (while informing defendant of gravity of crime charged, court advised defendant that he was charged with tampering with witness); *Gethers I,* supra, 193 Conn. 537 (defendant stated that he was aware that he was charged with two counts of robbery). In each of those cases, we concluded that the defendant had validly waived his right to counsel, although none of those decisions indicated that the defendant had been expressly apprised of the elements of the crimes charged.

Applying the appropriate constitutional standard to this record, we conclude that the defendant's waiver of his right to counsel and assertion of his right to represent himself were valid insofar as he comprehended "the nature of the charges and proceedings" against him. Practice Book § 961 (3). The defendant knew that he was charged with two counts of assault of a peace officer, and with one count of breach of the peace. He knew in detail the facts claimed by the state to constitute his guilt of those charges, through discussions with his counsel, through statements of those facts on the record in his presence, and through the police reports that he had in his possession. Furthermore, shortly after the court accepted his waiver of counsel and his assertion of his right of self-representation, but before any further proceedings had begun, the state handed him the substitute information, the clerk read it to him, and he pleaded not guilty and elected to be tried by a jury. That information contained the essential elements of the crimes charged. Neither the defendant nor his standby counsel, however, took any action to indicate that this additional specific information created any confusion in his mind regarding the nature of the charges.

B

We also agree with the state that this record is sufficient to support the presumption that the defendant's counsel, Delaney, had explained to him the nature of the offenses in sufficient detail to permit the trial court to conclude that § 961 (3) had been satisfied. *Gethers I*, supra, 193 Conn. 537. Contrary to the assertion of the Appellate Court that the defendant had proceeded pro se from the inception of his court appearances, the defendant was represented by Delaney from July 7, 1992, to November 18, 1992, when the defendant waived his right to counsel and proceeded to trial pro se. During that time, there were at least three pretrial hearings at which Delaney appeared on behalf of the defendant. At the July 21, 1992 hearing, Delaney appeared for the defendant and requested that the case be continued so that he could confer with his client. After having had the opportunity to speak with the defendant, Delaney again appeared for the defendant on July 22. Although Delaney described himself both as the defendant's counsel of record and as his standby counsel, Delaney argued a motion for bond reduction on his behalf. During that hearing, the assistant bail commissioner indicated that the defendant was charged with assault on a police officer. The assistant state's attorney also stated that the defendant had been publicly screaming and swearing at police officers and had fought with them, resulting in one officer being knocked unconscious. When the court asked Delaney if he would like to speak with the defendant about those issues, Delaney responded, "I've already spoken to him, Your Honor. He differs from what they said. He claims they came up and said a few things, he mouthed off, he wasn't mouthing off at them, he was talking to somebody else. He said they came over and got into his face and things started." Thus, the record affirmatively discloses that Delaney discussed the facts of the case with the defend-

ant. It is a fair inference from this record that, in representing the defendant in those pretrial hearings and in discussing those facts with him, Delaney also discussed with the defendant the legal significance of those facts. Accordingly, this record supports the presumption that Delaney sufficiently explained the nature of the charges to the defendant.

## C

Finally, we agree with the state that this record also discloses that the remaining requirements of § 961 were complied with.[16] It is evident from the waiver of counsel canvass; see footnote 9; that the trial court informed the defendant that he had a right to be represented by an attorney, who would act as either full counsel or standby counsel, inquired about the defendant's social, emotional and educational background, as well as his knowledge of trials, and discussed with the defendant his understanding of the consequences of representing himself and the possible punishments he faced if convicted. The trial court, therefore, properly concluded that the defendant had knowingly and intelligently waived his right to counsel.

Moreover, "the court should ascertain, through an appropriate inquiry, that the defendant possesses the intelligence and capacity to make the choice and to appreciate the consequences of his decision to represent himself. . . . Some of the factors bearing on the defendant's capacity include age, education, mental health, prior experience with criminal trials and consul-

---

[16] Although the Appellate Court based its decision on its conclusion that the trial court had not complied with the requirements of § 961 (3) and, therefore, did not address whether the trial court had properly concluded that the remaining requirements of § 961 had been met, because a brief examination of the waiver of counsel canvass reveals that the remaining requirements of § 961 were fulfilled, we shall, in the interest of judicial economy, reach that conclusion, rather than remanding the case to the Appellate Court for such a determination.

tation with counsel prior to proceeding pro se, although none of these inquiries is a constitutional necessity." (Citations omitted.) *State* v. *Townsend*, supra, 211 Conn. 221.

The waiver of counsel canvass here reveals that the defendant: (1) had completed two and one-half years of college; (2) had a history of emotional problems but did not currently require treatment or medication; (3) had prior experience as a defendant in a criminal trial; (4) had consulted with counsel prior to proceeding pro se; and (5) had standby counsel available to assist him throughout the entire trial. The trial court's inquiry pursuant to § 961 supports a conclusion that the defendant was competent to waive his right to counsel.

## II

We now turn to the first of the defendant's alternate grounds for affirmance. The defendant claims that the trial court improperly permitted him to represent himself without ordering, sua sponte, a competency examination,[17] pursuant to General Statutes § 54-56d (d).[18] The

---

[17] As we noted in part I C of this opinion, the court's inquiry pursuant to § 961 addressed the issue of competence. The defendant argues, however, that under the circumstances of this case, the trial court's determination of his competence pursuant to its inquiry was not sufficient, and that an independent competency examination was required.

[18] General Statutes § 54-56d provides in relevant part: "Competency to stand trial. (a) Competency required. Definition. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) Presumption of competency. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by clear and convincing evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

"(c) Request for examination. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

defendant concedes that every criminal defendant is presumed to be competent. General Statutes § 54-56d (b). The defendant also concedes that the state, he and Delaney, acting as his appointed counsel or his standby counsel, each failed to move for such an examination. General Statutes § 54-56d (c). The defendant argues, however, that the circumstances of this case, in which the trial court was faced with a defendant who had a

"(d) Examination of defendant. Report. If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the superior court, there is probable cause to believe that the defendant has committed the crime for which he is charged, the court shall order an examination of the defendant as to his competency. The court either may appoint one or more physicians specializing in psychiatry to examine the defendant or it may order the commissioner of mental health to conduct the examination either by a clinical team consisting of a physician specializing in psychiatry, a clinical psychologist and a psychiatric social worker, or by one or more physicians specializing in psychiatry. If the commissioner of mental health is ordered to conduct the examination, he shall select the members of the clinical team or the physician or physicians. If the examiners determine that the defendant is not competent, they shall then determine whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order under this section. The court may authorize a physician specializing in psychiatry, a clinical psychologist or a psychiatric social worker selected by the defendant to observe the examination. Counsel for the defendant may observe the examination. The examination shall be completed within fifteen days from the date it was ordered. The examiner or examiners shall prepare and sign, without notarization, a written report and file it with the court within ten days of the completion of the examination. On receipt of the written report, the clerk of the court shall cause copies to be delivered immediately to the state's attorney and to counsel for the defendant.

"(e) Hearing. The court shall hold a hearing as to the competency of the defendant no later than ten days after it receives the written report. Any evidence regarding the defendant's competency, including the written report, may be introduced at the hearing by either the defendant or the state. If the written report is introduced, at least one of the examiners must be present to testify as to the determinations in the report, unless his presence is waived by the defendant and the state. Any member of the clinical team shall be considered competent to testify as to the team's determinations. A defendant and his counsel may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent. . . ."

history of mental illness and was charged with crimes involving bizarre and irrational behavior, required that the trial court order, sua sponte, a competency examination before it permitted him to proceed pro se. The defendant further argues that, even if the trial court properly concluded, prior to the commencement of the trial, that he was competent, his behavior during the course of the trial, which eventually led the court to order a postverdict examination of him pursuant to § 17a-566, should have alerted the trial court that a § 54-56d (d) competency examination was required. The defendant asserts that, although he failed to raise these claims at trial, he is entitled to prevail under the doctrine of *State* v. *Golding*, supra, 213 Conn. 239–40.[19] We conclude that he may not prevail because his claim fails to meet the third prong of *Golding*.

We agree with the defendant that the record is adequate to review his claim and that, because "[t]he conviction of an accused person who is not legally competent . . . violates the due process of law guaranteed by the state and federal constitutions"; *State* v. *Gonzalez*, 205 Conn. 673, 686, 535 A.2d 345 (1987); his claim is of constitutional magnitude. The first two prongs of *Golding* are thus met. We therefore proceed to a consideration of the third prong, namely, whether the alleged constitutional violation exists that deprived the defendant of a fair trial.

The United States Supreme Court's decision in *Godinez* v. *Moran*, 509 U.S. 389, 399–400, 113 S. Ct. 2680,

---

[19] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

125 L. Ed. 2d 321 (1993), mandates that any defendant who is competent to stand trial as a matter of state law is competent to waive the right to counsel. *State* v. *Day*, supra, 233 Conn. 825. Accordingly, we focus our inquiry on whether a § 54-56d (d) examination was required in order to determine whether the defendant was competent to stand trial and, therefore, to waive the right to counsel.

The standard we use to determine whether a defendant is competent under state law to stand trial is that set forth in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (test for competence to stand trial is " 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him' "). The *Dusky* standard has been codified at § 54-56d (a), which provides that "[a] defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense."

A

The defendant first argues that, because the trial court was aware of his prior psychiatric history and was also aware that the crimes that he was accused of involved "irrational behavior," the court was constitutionally obligated to order a competency examination prior to accepting his waiver of counsel. We disagree.

"[T]he rule of *Pate* v. *Robinson* [383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)] imposes a constitutional obligation, under the due process clause, to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial . . . . When a *Pate* inquiry is required, a court may not

rely on the defendant's subjective appraisal of his own capacity or on the court's personal observations of the defendant but must hold an evidentiary hearing into the defendant's competence. . . .

"A defendant who challenges the validity of his [waiver] for lack of an evidentiary inquiry into his competence must make a showing that . . . the court had before it specific factual allegations that, if true, would constitute substantial evidence of mental impairment. *Sanders* v. *United States*, 373 U.S. 1, 21, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963). Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency." (Citations omitted; internal quotation marks omitted.) *State* v. *Watson*, 198 Conn. 598, 605, 504 A.2d 497 (1986).[20] "The decision to grant [an evidentiary] hearing [into a defendant's competence] requires the exercise of sound judicial discretion." *State* v. *Lloyd*, 199 Conn. 359, 366, 507 A.2d 992 (1986).

At the time that it accepted the defendant's waiver of counsel, the trial court was aware that the defendant: (1) had completed two and one-half years of college; (2) had a past history of mental illness but was not currently receiving psychiatric treatment or taking medication; and (3) had been fully and adequately informed of the consequences of representing himself. Although

---

[20] *State* v. *Watson*, supra, 198 Conn. 598, involved a challenge to the validity of a guilty plea on the ground that the trial court had failed to inquire adequately into the defendant's competence at the time the plea was entered. Because the standard used to determine competency to stand trial is the same as that used to determine competency to plead guilty or to waive the right to counsel; *State* v. *Day*, supra, 233 Conn. 823; the principles articulated in *Watson* apply with equal force in the present case.

the defendant was occasionally rude and argumentative during the waiver of counsel canvass, he gave rational and coherent responses to the trial court's questions. His answers indicate that he was aware that, if he lost the case, he faced the possibility of twenty years in prison and that, as a result of a previous trial, he had some familiarity with courtroom procedure. Furthermore, prior to the trial court's acceptance of the defendant's waiver, he had been observed by three judges during seven pretrial hearings, four representatives of the state's attorney's office, and Delaney, none of whom saw fit either to request or to order a competency examination pursuant to § 54-56d (d). See footnote 18. The trial court could reasonably have concluded that insufficient evidence had been generated to raise a reasonable doubt concerning the defendant's ability to understand the proceedings or assist in his own defense and, therefore, that an independent competency inquiry was not required prior to acceptance of his waiver of counsel. See *State* v. *DesLaurier*, 230 Conn. 572, 587–88, 646 A.2d 108 (1994) (independent competency examination not required if defendant [1] did not suffer from known or apparent mental illness that would impair ability to understand proceedings or assist in defense, [2] possessed minimum communication skills, [3] understood basic charges against him and right to accept or reject plea bargain, and [4] understood consequences of decision); *State* v. *Watson*, supra, 198 Conn. 605–606 (*Pate* inquiry not required if only evidence of possible incompetency was defendant's unsubstantiated reference to history of psychiatric treatment and medication). We cannot conclude, therefore, that the trial court abused its discretion in failing to order, sua sponte, a *Pate* inquiry. With regard to the trial court's initial acceptance of the defendant's waiver, therefore, the defendant has failed to meet the third prong of *Golding*.

## B

The defendant also argues that, even if he had been competent at the time the trial court accepted his waiver of counsel, events that occurred during the course of the trial, specifically, his (1) failure to make a motion to sever the two cases, (2) lack of understanding of the voir dire process, (3) elicitation of prejudicial material from other similar incidents,[21] (4) inappropriate behavior such as rudeness and throwing papers, and (5) lack of understanding of trial procedure, raised a reasonable doubt about his continued competence, and that the trial court, therefore, should have suspended the trial and ordered a competency examination. We disagree.

We agree that a defendant who is competent at the commencement of a trial may later become incompetent and that, when a reasonable doubt concerning the defendant's competency is raised, the trial court must order a competency examination. *State* v. *DesLaurier*, supra, 230 Conn. 589 n.12. Much of the defendant's argument, however, is based on the inadequacy of his legal skills as evidenced by examples of strategic errors he made in the course of representing himself. We are not persuaded that the defendant's incompetence to stand trial is demonstrated by his lack of legal competence to try his case skillfully.

---

[21] The defendant's theory of defense was that there was a police conspiracy against him and that Miele and Buyak had, as a form of harassment, initiated the confrontation in this case. In support of his theory that there was a police conspiracy, the defendant introduced evidence of other confrontations between himself and the police. Although the defendant's acknowledgment of previous confrontations with the police may, in fact, have been prejudicial to his case, the defendant's claim of a police conspiracy is not, in and of itself, sufficient to require a competency examination where, as in this case, the trial court was aware prior to the presentation of evidence that this was his theory of defense and had warned him of the possible prejudicial effect of revealing that he had been involved in previous altercations with the police, and where the rest of the record supports a finding of the defendant's competency.

The competence that is required for a defendant's waiver of counsel to be valid is not, as the defendant suggests, the competence to *represent himself*, but is, rather, the competence to *waive the right* to counsel. *Godinez* v. *Moran*, supra, 509 U.S. 399–400. "Thus, while it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts . . . a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (Citation omitted; internal quotation marks omitted.) Id., 400. "We harbor no illusions that a defendant's decision to waive counsel and proceed pro se generally will lead to anything other than disastrous consequences. . . . Nonetheless, the values informing our constitutional structure teach that although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." (Citation omitted; internal quotation marks omitted.) *State* v. *Day*, supra, 233 Conn. 821. The defendant's skill in representing himself, therefore, is of marginal relevance to his competence to choose self-representation.

The defendant also argues that the trial court's decision to order a presentence psychiatric examination pursuant to § 17a-566; see footnote 12; indicates that the trial court became aware during the course of the trial that the defendant was mentally impaired and, accordingly, should have ordered a § 54-56d (d) examination.[22] That argument is equally unavailing.

We must presume from the fact that the trial court ordered a § 17a-566 (a) examination that it suspected

[22] The defendant does not claim that the content of the § 17a-566 examination demonstrates that the trial court should have ordered a competency examination. He argues only that the fact that the trial court ordered a § 17a-566 examination indicates that it should have ordered a competency examination.

that the defendant was "mentally ill and dangerous to himself or others." Nevertheless, "[a]n accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense." *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986). Section 17a-566 serves as a sentencing tool. The fact that the trial court suspected that the defendant might be mentally ill and ordered a § 17a-566 examination to assist it in determining whether the defendant required custodial care and treatment at Whiting Forensic Institute, rather than incarceration within the correctional system, does not, therefore, compel a conclusion that it had reason to believe that any mental impairment from which the defendant suffered prevented him from presenting a defense or proceeding pro se. Thus, with regard to the trial court's continued acceptance of the defendant's waiver, the defendant has failed to meet the third prong of *Golding*.

## III

The defendant's second alternate ground for affirming the judgment of the Appellate Court is that the trial court improperly instructed the jury regarding the element of intent necessary to find him guilty of breach of the peace. The defendant claims that the trial court's instruction failed to include the judicial gloss that we applied, after the present case had been tried, to the same mens rea language in the disorderly conduct statute. See *State* v. *Indrisano*, 228 Conn. 795, 806–19, 640 A.2d 986 (1994). Because this claim was not preserved in the trial court, the defendant seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40, or, in the alternative, under the plain error doctrine. See Practice Book § 4185. We conclude that the defendant may prevail under *Golding*.

We agree with the defendant that the record is adequate for review and that he has raised a claim of consti-

tutional magnitude. It "is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. *State* v. *Williamson*, 206 Conn. 685, 708, 539 A.2d 561 (1988). The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." (Internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 483–84, 668 A.2d 682 (1995). The defendant's claim is, therefore, of constitutional magnitude.

Moreover, it is clear from the record that the constitutional violation exists. The trial court's mens rea instruction simply restated the pertinent language of § 53a-181; see footnote 3; and then referred to the generalized instruction that the court had given on intent: "It must be proved by the state beyond a reasonable doubt that the defendant intended to cause inconvenience, annoyance, or alarm in a public place by the commission of the forbidden conduct, which, in this case, is using abusive or obscene language. I remind you of what I just told you about intent. A person acts intentionally, with respect to a result, or to conduct, when his conscious objective is to cause such result, or to engage in such conduct."

The statutory language setting forth the intent required for conviction of breach of the peace is identical to the language in General Statutes § 53a-182 (a),[23]

[23] General Statutes § 53a-182 provides: "Disorderly conduct: Class C misdemeanor. (a) A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person; or (3) makes unreasonable noise; or (4) without lawful authority, disturbs any lawful assembly or meeting of persons; or (5) obstructs vehicular or pedestrian traffic; or (6) congregates with other persons in a public place and refuses to comply with a reasonable official request or order to disperse.

"(b) Disorderly conduct is a class C misdemeanor."

which states the mens rea necessary for conviction of disorderly conduct. In order to avoid constitutional vagueness problems, we have applied interpretive gloss to the mens rea language of the disorderly conduct statute. *State* v. *Indrisano*, supra, 228 Conn. 795. In *Indrisano*, we concluded that "the mens rea language of § 53a-182 (a) can be formulated more precisely as follows: the predominant intent is to cause what a reasonable person operating under contemporary community standards would consider a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm. In order to sustain a conviction for disorderly conduct, the state must begin by demonstrating that the defendant had such a state of mind." Id., 810–11. The need to apply interpretive gloss to § 53a-182 (a) that we perceived in *Indrisano* is equally present with regard to § 53a-181.

We therefore proceed to consideration of whether the trial court's failure to include the *Indrisano* gloss in the jury instructions was harmless. The defendant argues that the state has not satisfied its burden of demonstrating that the improper jury instruction was harmless beyond a reasonable doubt. We agree.

Miele, Buyak and Connolly all testified that the defendant had been shouting and swearing at the police officers, thus attracting the attention of passersby, and that in response to the defendant's behavior, Miele and Buyak had approached the defendant, who hit Miele. A struggle then ensued between the defendant and the officers, during which all three fell down the stairs, resulting in injuries to the officers. The defendant, on the other hand, testified on direct examination that he had been standing outside the train station but had not been shouting at Miele and Buyak, and that the two officers had approached him and asked him if he had a problem, to which he had responded, "Yes. The Hart-

ford police are fucking me." According to the defendant, Miele then grabbed hold of the defendant's arm and the defendant, in an attempt to free himself, hit Miele. On cross-examination, the defendant testified that when the officers had asked him if he had a problem, he had responded only, "No," and had not used abusive or obscene language and had not struck Miele.

Given that the testimony concerning this event is ambiguous regarding the defendant's intent, it cannot be said beyond a reasonable doubt that the trial court's omission of the *Indrisano* gloss did not contribute to the verdict. In other words, the jury, under the trial court's instruction, could have fully credited the defendant's testimony that his only provocative conduct was the statement "[t]he Hartford police are fucking me," and, nevertheless, still found him guilty of breach of the peace, a result that is constitutionally infirm. The fourth prong of *Golding* is, therefore, satisfied and the defendant is entitled to a new trial on the breach of the peace charge.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to affirm the judgment of the trial court with respect to the assault of a peace officer charges, and to remand the case to the trial court for a new trial on the breach of the peace charge.

In this opinion PETERS, C. J., and CALLAHAN and PALMER, Js., concurred.

BERDON, J., dissenting. I would affirm the Appellate Court's decision that the defendant be granted a new trial on the alternate ground that the trial court should have ordered a competency hearing prior to permitting the defendant to waive his right to counsel. Because this issue was not raised at trial, the court engages in

a *Golding*[1] review to determine whether it can be raised on appeal. Although the majority concedes that the issue involves a claim of constitutional magnitude and that the record is sufficient, they refuse to review the claim because a violation does not clearly exist. I disagree.[2]

The trial court has an obligation to undertake an independent judicial inquiry to determine if the defendant is competent. *State* v. *Lloyd*, 199 Conn. 359, 366, 507 A.2d 992 (1986). That obligation not only extends to whether the defendant is competent to be tried; id.; but also whether he is competent to waive his right to counsel. See *Godinez* v. *Moran*, 509 U.S. 389, 398, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (standard of competency for pleading guilty or waiving right to counsel is same as competency standard for standing trial). Before it may allow the accused to proceed through the treacherous path of self-representation, and throughout the course of the proceedings, a trial court is obliged to determine whether he is competent to waive his right to counsel. Id., 399–400.[3]

As a result of our chaotic procedure of constantly reassigning trial judges, a defendant, as in this case, may appear before several judges during preliminary proceedings and before yet another different judge for trial. In order to afford the defendant due process of

---

[1] *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989) (certain unpreserved claims may be raised on appeal).

[2] I note that there are some constitutional claims involving fundamental rights, such as the right to counsel, that should not be subject to *Golding* scrutiny because the violation of the right is patently obvious in its deprivation. Moreover, as in this case, it defies logic and reason to believe that the defendant should seek a competency examination of himself to determine whether he is competent to waive his right to counsel.

[3] I recognize that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself." (Emphasis in original.) *Godinez* v. *Moran,* supra, 509 U.S. 399.

law, it only stands to reason that his claim must be measured by the collective knowledge of the trial judges he appeared before. Nevertheless, in this case, the individual knowledge of several of the trial judges was sufficient to alert them that they were required to suspend the pretrial and trial proceedings in order to determine the defendant's competency.

Recently, in *State* v. *Day*, 233 Conn. 813, 661 A.2d 539 (1995), this court held the following: "While a defendant has an absolute right to self-representation, that right is not self-executing. A trial court in this state must satisfy itself that several criteria have been met before a criminal defendant properly may be allowed to waive counsel and proceed pro se. A waiver [of the right to counsel] will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant: (1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled; (2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself; (3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and (4) Has been made aware of the dangers and disadvantages of self-representation. Practice Book § 961.

"At the same time, we have recognized that this test cannot be construed to require anything more for an effective waiver of counsel than is constitutionally mandated, because such a waiver triggers the constitutional right of an accused to represent himself. . . . The multifactor analysis of § 961, therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that deci-

sion in a knowing, voluntary and intelligent fashion." (Citations omitted; internal quotation marks omitted.) Id., 822–23.

In my view, there was substantial evidence to indicate that the defendant may have been mentally impaired, and thus unable to waive his right to counsel in a knowing and intelligent fashion. Consequently, the trial court should have ordered a competency hearing pursuant to General Statutes § 54-56d. The majority's focus on the facts, which allows it to reach its conclusion, is so narrow that it defies credulity. Despite the following information, which the trial court had before it, the majority claims that there was insufficient evidence to review the defendant's claim.

First, a police officer's own version of the defendant's bizarre conduct, which led to his arrest in this case, is telling of the defendant's mental instability and possible incompetency. According to Stephen J. Miele, an officer with the Hartford police department, on May 26, 1992, the defendant, for some unknown reason, began shouting vulgarities at him and Laura Buyak, another Hartford police officer, who were in the process of arresting an unrelated individual. When the officers approached the defendant to ask him to calm down and to explain why they were arresting the other individual, he physically lashed out, striking Miele in the chest. The defendant continued to flail his arms, causing the two officers and himself to fall down a flight of stairs, thereby knocking Buyak unconscious. The defendant continued to punch Miele and attempted to bite him. Ultimately, the defendant was overpowered and handcuffed.

Second, as known by one of the pretrial courts and the trial court, the defendant had a history of mental illness and had a prior conviction of assaulting and kidnapping his parents, an event which illustrated his

mental illness.[4] As a senior in high school, the defendant began seeking treatment from a psychiatrist. A few years later, after leaving college, the defendant suffered a "psychotic decompensation," i.e., a nervous breakdown. Subsequently, the defendant was diagnosed as a "schizo-effective" and underwent several psychotic hospitalizations and outpatient treatments.

Third, the defendant explained his actions and based his defense on his belief that the Hartford police force

[4] "On December 28, 1989, the defendant was living with his parents, Gunther and Elvira Wolff, at the family residence at 438 Fern Street, West Hartford. Gunther Wolff, a sixty-five year old self-employed engineer, was working in his second floor study at about 4 p.m. when the defendant entered the study. The defendant told Gunther that he wanted to use some of the tools that Gunther had stored there. When his father declined to permit the defendant access to the tools, the defendant attempted to obtain them by force, throwing his father to the floor and keeping him pinned down to the floor by kneeling on his legs. During the next forty-five minutes, approximately, the defendant kept his father pinned to the floor, lectured him, and occasionally banged his head against the floor.

"At about 4:45 p.m., Elvira Wolff, who had been out, returned to the house. Alerted by noise upstairs, she entered the study on the second floor and saw her husband and the defendant on the floor. She screamed and attempted to pull the defendant off of his father. The defendant then verbally and physically assaulted his mother for a period of about sixty minutes. The defendant yelled at her and slapped her across the face and chest a number of times. Both victims wanted to leave the room, but were afraid to attempt to do so. Although there was a telephone in the room, neither victim attempted to use it. The defendant positioned himself between his parents and the door so that they could not leave without going around him. At one point, the defendant's father attempted to smash a window in the study in order to summon help, but was unsuccessful.

"The defendant's mother told him that she expected guests for dinner and that she had to prepare the meal. The two victims and the defendant then went to the kitchen. Subsequently, the defendant's father asked the defendant if he could take a walk in the neighborhood. The defendant replied that they could leave whenever they wanted. Both parents left the house, went to the nearest telephone and contacted the West Hartford police department. When the police responded, they found the defendant in the garage, working under the hood of an automobile. While his father was visibly upset, the defendant appeared calm and cooperative." *State* v. *Wolff*, 29 Conn. App. 524, 525–27, 616 A.2d 1143 (1992).

The Appellate Court reversed the defendant's conviction and ordered a new trial because the trial court's instructions created a reasonable possibility that the jury was misled. Id., 533.

was conspiring to harass him and have him evicted from various homeless shelters in Hartford. The defendant had been arrested on two previous occasions for assaulting various Hartford police officers: the defendant allegedly assaulted Albert DeStefano on December 20, 1991, because DeStefano wished him a Merry Christmas; and the defendant allegedly assaulted Frederick J. Reinert on March 3, 1992, when the defendant tried to elude questioning. Only the incident that occurred on May 26, 1992, involving Miele and Buyak, was at issue in this case. Nevertheless, the defendant's unfounded paranoid defense presented at trial, which discussed the details of these separate incidents, opened the door for the admission of highly prejudicial evidence.

Fourth, after reading the entire transcript of the trial, it is apparent to me that a competency hearing was warranted. Certain exchanges and comments made by the defendant indicate his possible incompetence. For example, when informed by the court that DeStefano would not be available as a witness because he had recently left on vacation, the defendant responded: "Your Honor, that . . . is completely unjust. I mean, DeStefano—I base my whole case on DeStefano. I say the man has a personal vendetta against me. And I say he's . . . the criminal in this situation. I mean, he's the one that knew . . . the trial was about to start. He's playing his cards perfectly. He's very smart. Now he's getting away with this. He . . . he was here last week. He knew the trial was about to start. And he left on a Friday, and . . . today is Monday."

A second example of the defendant's paranoia and disjunctive thinking occurred while he was questioning Ramona Rucker, a security guard at the Civic Center mall:

"Q. Would you say that I'm capable of running?

"A. Yes you are. Yeah.

"Q. Would you say that I'm capable of running faster than you?

"A. I don't know. I've never chased you.

"Q. Are you saying that I'm a coward?"

As a third illustration, in his closing argument to the jury, the defendant stated: "You've heard my testimony, which I hope you found to be warm, calm and spontaneous. I am alone here, but only in appearance. I have had help from millions, upon millions of people in a subtle and undeniable way."

Indeed, during his redirect examination of police officer Sergio Khuzkian, the defendant asked the witness to state his opinion of him. Khuzkian responded: "Mr. Wolff, you're not a well man, in my opinion from where I know you. As a matter of fact, I think [you are] crazy, and I think that you need some kind of mental help. And for me to sit here and have you question me I find ridiculous. From where I see you, from the point where I first met you, who was a man who was down and out on his luck, to a point where you've gone totally insane, to the point where you don't even recognize me and you swear at me. You're constantly abusive to people downtown, to the officers, and you constantly—and it's like—like—it's obvious that everybody knows you because of your actions. And I'm there five days a week, and I see you there five days a week. I see you downtown acting in an insane manner."

Furthermore, after the verdict was returned, but before passing sentence, the trial court ordered that the defendant undergo a sixty day psychiatric examination at Whiting Forensic Institute. Subsequently, Carol Caplan, a member of the psychiatric team that evaluated the defendant at Whiting, testified that the defendant's mental condition had evolved and that he presently suffered from a paranoid disorder, which caused him

to be "a high risk of dangerousness to himself or to others when his paranoid disorder is most severely out of order." As a result of that condition, Caplan observed that the defendant's thinking was illogical and that "[h]e often draws illogical conclusions." Nevertheless, because the defendant refused medication that was prescribed to him, the psychiatric team recommended that he be sentenced in accordance with his conviction. In passing sentence, the trial court noted that the defendant "has specifically and unequivocally stated [that] he will not take medication, and that is what he needs." The court then accepted the recommendation of the Whiting Forensic Institute and committed the defendant to the custody of the commissioner of correction for a period of ten years.

Under these circumstances, the thought of allowing the defendant to waive his right to counsel without adequately determining his competency is alarming. When information of this sort and volume comes to the attention of the trial judge, he or she is required to conduct an independent inquiry to determine the defendant's competency before allowing the defendant to waive his or her right to counsel. Likewise, during a trial in which a defendant is representing himself, the trial court may be obliged to reevaluate its order regarding the waiver of counsel. See *State* v. *Lloyd*, supra, 199 Conn. 365.

I also question the majority's imputation of some import to the fact that the defendant completed two and one-half years of college and the fact that he is not currently receiving psychiatric treatment or taking medication. I find neither of these facts insightful into whether an individual may be competent to waive his or her right to counsel. Certainly there are highly educated individuals who, due to mental illness, are incompetent. Likewise, there are certainly individuals who suffer from mental illness who are not taking medication that

may in fact cure or minimize their illness and render them competent. See *State* v. *Garcia*, 235 Conn. 671, 669 A.2d 573 (1996). Indeed, in this case, the trial court noted that "one thing that [the defendant] needs is medication."

Accordingly, I would affirm the Appellate Court's order that the defendant be granted a new trial.