[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION RE: COMPETENCY TO STAND TRIAL
CT Page 10642
The court concludes that defendant Kenneth Curtis is competent to stand trial on the charge of murder in violation of General Statutes § 53a-54a(a), which charge arises from the death of Donna Kalson on October 30, 1987. It is quite clear to this court that Kenneth Curtis has purposely exaggerated his symptoms in an effort to influence the outcome of this criminal prosecution.
 I. History
The basic facts of this case and early procedural history are set forth in State v. Curtis, 22 Conn. App. 199, 476 A.2d 1299
(1990). "On October 30, 1987, the defendant allegedly shot two victims. One died later that day from a gunshot wound to the head, and the other received a nonfatal wound to the leg. Immediately after these shootings, the defendant shot himself in the head, causing extensive organic brain injury. In June, 1988, the defendant was charged with murder in violation of General Statutes 53a-54a (a), attempted murder in violation of General Statutes 53a-49 and 53a-54a (a), and assault in the first degree in violation of General Statutes 53a-59 (a)(1).
"Several competency hearings were held pursuant to General Statutes 54-56d. At the first hearing, in August, 1988, the trial court, Barnett, J., found that the defendant was incompetent to stand trial. See General Statutes 54-56d (a). The court was unable, however, to make a further finding as to whether there was a substantial probability that the defendant's competency would be restored; see General Statutes 54-56d (f); and it ordered a reexamination of the defendant. Additional hearings were held on the issue of the defendant's potential for restoration.
"At [a] . . . competency hearing [held on June 5, 1989], the trial court, Damiani, J., found that the defendant was incompetent, and that there was no substantial probability that the defendant, if provided with a course of treatment, would regain competency within the eighteen month placement period. See General Statutes 54-56d (f) and (i). The court then properly determined that its actions were governed by General Statutes54-56d (m)." Id. at 201. The trial court then ordered the defendant released from custody and imposed as a condition of CT Page 10643 release a requirement that the defendant submit to an annual examination for the purpose of determining whether his competency has been regained. Upon the defendant's appeal from this ruling, the Appellate Court held that the trial court did not have the authority to require the defendant to submit to an annual examination and remanded the case with direction that an unconditional order of release be entered. The court, Ronan, J., ordered the defendant unconditionally released on June 27, 1990.
On November 4, 1997, the defendant was rearrested on a warrant charging him with the 1987 murder of Donna Kalson. On November 14, 1997, the state requested the court to order the defendant to submit to an examination pursuant to General Statutes § 54-56d to determine his competency to stand trial. On February 13, 1998, the court, Ronan, J., ordered the Office of Court Evaluations to conduct a competency evaluation. The defendant appealed from this order to the Appellate Court. The Appellate Court dismissed the appeal on April 22, 1998. The defendant thereupon petitioned the Supreme Court for certification to appeal from the Appellate Court. The Supreme Court denied the petition on June 10, 1998.
 II. Competency Standard
"The standard we use to determine whether a defendant is competent under state law to stand trial is that set forth inDusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824
(1960) (test for competence to stand trial is `"whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him"'). The Dusky standard has been codified at § 54-56d(a), which provides that `[a] defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense."' State v. Wolff, 237 Conn. 633, 663,678 A.2d 1369 (1996).
 III. Discussion
Pursuant to the court's order, the Office of Court Evaluations examined Curtis, reviewed voluminous documents concerning his medical and educational history and interviewed persons who have treated him, taught him, and socialized with CT Page 10644 him. The evaluation team consisted of Dr. Paul Amble, Dr. Eileen McEvoy, and Dr. Guay Chatfield. Dr. Amble is a medical doctor specializing in forensic psychiatry and is presently employed as a clinical professor at Yale University in the Department of Psychiatry. Dr. McEvoy is a clinical psychologist. Dr. Chatfield is a psychiatric social worker.
In considering Curtis' competency, the evaluation team considered Curtis' ability, to assimilate information, his capacity for abstract reasoning, and his ability to communicate with others. While Curtis is slow in processing information, the team concluded that this impairment is not of an extent that would render him unable to understand the charges and proceedings or to be unable to participate in his own defense. The team found that Curtis was able to discuss his charge and the appeal process rationally with various persons, including his psychiatrists, neurologist, and a college instructor. The team concluded that there is a reasonable degree of medical certainty that Curtis is able to understand the charge against him and to participate in his defense. This conclusion is supported by credible and persuasive evidence, which is discussed in the following paragraphs.
Dr. Amble testified as to the team's findings. On January 6, 1999, the team examined Curtis for four and one-half hours. During this interview, Curtis gave slow and impoverished responses. Significantly, the nature of his responses varied depending on the topics being discussed. When Curtis discussed the charge, he responded slowly. When he discussed other issues, his responses were significantly better. After the interview, the members of the team considered whether Curtis had deliberately been slow.
Given the inconsistences of the examination, the team thought it was important to look at a variety of sources. The team spoke to Curtis' parents, a home health aide, the supervisor of the facility where he lives, professors at the colleges he attended, his neurologist, and two psychiatrists. The description of Curtis that the team received from these various sources was of a person who had a level of functioning that was inconsistent with that shown during the four and one-half hour interview.
Dr. Amble testified that four college instructors found Curtis to be a very intelligent, a very high functioning person. They gave him grades that indicate he functioned at a high level. CT Page 10645 A professor at Middlesex Community Technical College described Curtis as being above and beyond most of the students he had at the college. A professor at Southern State University described Curtis as being very attentive and related that Curtis would talk to him after every class for ten minutes. It appeared to the professor that Curtis understood the information that was discussed during class and that Curtis reasonably conversed after class.
Dr. Amble testified that Curtis' neurologist, Dr. Susan Spencer, described Curtis' ability to function as "quite high." She related to Dr. Amble that Curtis could remember past medication regimens and their effects on him. She further related that Curtis clearly had the capacity to formulate memory. Dr. Amble also spoke to Dr. Julien Lieb, a psychiatrist who treated Curtis for five to six years. Dr. Lieb told Dr. Amble that Curtis did not have substantial or significant cognitive deficits. Dr. Lieb described the psychotropic medication that Curtis had been taking and stated that the medication did not impact in any significant way on Curtis' cognitive functioning.
The team viewed a video tape, Exhibit D, which was secretively made by a TV newsperson sometime between the end of September and the beginning of October, 1997. The video tape shows Curtis at school in a wheelchair having a conversation with a news reporter. The tape shows Curtis posturing and responding differently than he did during the four and one-half hour interview.
In reviewing previous reports concerning Curtis' competency, Dr. Amble noted that the earlier findings were inconsistent with the medical history that was recorded immediately after Curtis' injury. After Curtis shot himself, he was initially treated at Bridgeport Hospital where he was in a coma for a week. A couple of months after the shooting, a clinician wrote that Curtis had retained much of his cognitive functioning. Curtis was transferred to Gaylord Hospital where his individual therapist noted that the Curtis' higher cortical functioning remained well preserved and that Curtis had made significant improvements in his cognitive status. Curtis was discharged from Gaylord in May of 1988. His discharge diagnosis did not reflect any cognitive difficulty. Dr. Amble observed that the competency report of August 19, 1988, was "in stark contrast to those findings at Gaylord Hospital at that time." CT Page 10646
In a psychological report prepared in connection with a competency report dated December 7, 1988, Exhibit 3, Curtis is described as having an IQ of"62 placing him within the mild mentally retarded range of tested intelligence." A similar statement appears in a psychological report that was prepared in connection with a competency report dated May 25, 1989. Because scores on the psychological tests remained unchanged between December and May, the evaluators concluded in May of 1989 that Curtis could not be restored to competency. Dr. Amble notes that subsequent to these competency examinations Curtis was examined at Gaylord where his IQ tests showed him to be in the average range.
The team concluded that Curtis' impoverished answers during the four and one-half hour interview on January 6, 1999, were due to his "exaggerating or feigning deficits in order to be seen as not competent to stand trial." See, Exhibit A, pg. 26. The team considered alternate explanations for his impoverished answers, e.g. new neurological trauma, depression, overwhelming grief reaction. Their conclusion that Curtis was malingering is supported by substantial evidence and the testimony of other persons who testified at the hearing.
Mary Ann Ellison testified that she met Curtis while they were serving as volunteers at Gaylord Hospital. They became friends, dined together, attended movies together and socialized from the spring of 1993 through the summer of 1994. She talked to Curtis several times a day over the phone. She relates how Curtis advertised for a driver and interviewed persons for the job. Eventually, he offered her the job. She drove him to various places in his van. Curtis balanced and kept care of her check book. She observed him reading text books and working at his computer. Curtis discussed with her the factual circumstances of the 1987 shooting and explained to her how he could prove the incident was not premeditated. On December 17, 1993, Curtis accompanied Ellison to her employer's Christmas party. A photograph of them, which was taken at the party, Exhibit C, depicts a man who appears bright, cheerful and alert, which demeanor is different from that displayed during the four and one-half hour interview.
Dr. Susan Spencer, who is a medical doctor and professor of neurology at Yale Medical School, testified that she began treating Curtis in April of 1993. She initially saw him two to three times a month and then at six month intervals. She last saw CT Page 10647 him in December of 1998. She related that Curtis was able to respond to her questions and that he would keep tract of his medicines and report the effects to her. In December of 1997, he complained to her that he was being tried in the media and explained that he was uncertain about what would happen with his case. Dr. Spencer did not notice any cognitive slowing. She wrote a note that he was quite spontaneous although she also observed that his responses fluctuated somewhat, sometimes he responded slowly and other times he would respond quickly.
Patricia Sawyer, who is a professor of psychology and sociology at Middlesex Community Technical College, testified that Curtis was a student in six courses that she taught. She was Curtis' academic adviser. She described him as being a very good student. She gave him grades of A and A minus. He excelled in psychology. He actively participated in class and could explain concepts when other students could not. Curtis participated in two internship programs that involved his doing volunteer work at Gaylord Hospital and at a place that helps persons who suffer from Alzheimer's disease. Curtis prepared proposals for these internships and submitted them to Professor Sawyer for her approval. See Exhibits E, F, and G.
Peter Sakalowski, who is a professor at Southern State University, testified that he met Curtis in the fall of 1997. He observed Curtis during approximately eight class meetings until Curtis left school shortly before he was rearrested. Professor Sakalowski related that Curtis appeared to follow the lectures and to understand and assimilate the information. Curtis would respond to Sakalowski's inquiries.
Because Curtis was previously found incompetent, the court has evaluated the evidence with the view that the state has the burden of proving that Curtis is competent to stand trial. The court concludes that the state has shown by clear and convincing evidence that Curtis is able to understand the proceedings against him and is able to assist in his own defense. He is competent. This conclusion is not altered by the evidence presented by the defense.
The nub of this case, according to a psychiatrist who testified for the defendant, is whether Curtis' academic performance can be reconciled with the manner in which he presented himself during the four and one-half hour interview on January 6, 1999. Was he malingering or is there another CT Page 10648 acceptable explanation for his conduct?
The witnesses who testified on behalf of Curtis contend that Curtis' brain injury has permanently impaired his ability to handle stress and that stress causes him to have a total mental collapse. They also report that he suffers from retrograde and anti-grade amnesia. The diagnosis of amnesia is based on what Cutis told the examiners, which they assumed to be truthful. They explain his success at Middlesex Community Technical College by arguing that it was an easy college, that he was in an environment where he was relaxed, that he did not take hard courses, that he received help, and that he and other students benefitted [benefited] from grade inflation. The court finds that the defense's explanation of Curtis' demonstrated abilities in school and social environments is not credible.
 Conclusion
While Kenneth Curtis does have cognitive impairments that were caused by a brain injury, these impairments do not prevent him from understanding and comprehending information and from making rationale decisions. He is able to understand the proceedings against him and assist in his own defense. He is competent to stand trial.
George N. Thim, Judge