## STATE OF CONNECTICUT *v.* JOSE GARCIA
### (15303)

Peters, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued October 31, 1995—decision released January 2, 1996

*Monte P. Radler*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, deputy assistant state's attorney, with whom were *Judith M. Rossi*, assistant state's attorney, and, on the brief, *Eugene J. Callahan*, state's attorney, and *David Cohen*, senior assistant state's attorney, for the appellee (state).

PER CURIAM. This appeal[1] raises two issues: (1) whether this court had the authority to stay the running

---

[1] The defendant appealed to this court purportedly pursuant to General Statutes §§ "51-199 (b) (a)" and "52-265a (a)." We presume that the reference to § "51-199 (b) (a)" means § 51-199 (b), because there is no § "51-199 (b) (a)." This appeal does not fall within any of the provisions of § 51-199 (b)

of the statutory eighteen month period for commitment for the restoration of the defendant's competency during the pendency of his prior interlocutory appeal; and (2) whether the trial court properly concluded that the state had proven by clear and convincing evidence that, to a reasonable degree of medical certainty, involuntary medication of the defendant will restore his competency to stand trial and that the drug regimen prescribed for him will not cause an unreasonable risk to his health.

This is the second appeal by this defendant that we have considered. In *State* v. *Garcia*, 233 Conn. 44, 84–86, 658 A.2d 947 (1995) (*Garcia I*), we held that "[i]n order for a court to authorize the involuntary medication of an incompetent defendant to render him competent to stand trial . . . the state must demonstrate [by clear and convincing evidence] that: (1) to a reasonable degree of medical certainty, involuntary medication of the defendant will render him competent to stand trial; (2) an adjudication of guilt or innocence cannot be had using less intrusive means; (3) the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interest; (4) the proposed drug regimen will not cause an unreasonable risk to the defendant's health; and (5) the seriousness of the alleged crime is such that the state's criminal law enforcement interest in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination." In addition, sua sponte, we addressed the issue of what effect an appeal by the defendant from an involuntary medication order may have on the running of the time limit imposed on involuntary commitment for restoration of compe-

for direct appeal to this court. Moreoover, the appeal was not properly within the scope of § 52-265a, because it was not certified as such by the Chief Justice. Thus, the appeal was properly within the jurisdiction of the Appellate Court. Nonetheless, this court retained jurisdiction of the appeal pursuant to General Statutes § 51-199 (c) and Practice Book § 4023.

tency pursuant to General Statutes § 54-56d. We remanded the case to the trial court to determine whether the state had met its burden of demonstrating by clear and convincing evidence each of the requisite factors for the involuntary medication of an incompetent defendant and held that "the running of the eighteen month period was stayed on August 26, 1994, when the defendant appealed to the Appellate Court. It shall recommence on the eleventh day after [the decision in *Garcia I*]." Id., 93.

After a further evidentiary hearing, the trial court found that the state had demonstrated by clear and convincing evidence each of the requisite factors. Accordingly, the trial court issued an order authorizing the state to medicate the defendant involuntarily. Additionally, the trial court rejected the defendant's argument that this court lacked the authority to stay the running of the statutory eighteen month period of commitment during the defendant's initial appeal. This appeal followed.

I

We first address the defendant's challenge to our authority to toll the running of the statutory period during which the state may attempt to restore the defendant's competency to stand trial. Pursuant to § 54-56d (i) (1), if there is a substantial probability that competency can be restored, a defendant who is deemed incompetent to stand trial may be committed for a period "of the maximum sentence which the defendant could receive on conviction of the charges against him or eighteen months, whichever is less." This statutory provision was enacted in response to *Jackson* v. *Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), so as to ensure that defendants are not committed for indefinite periods. In this case the defendant is charged with murder. Thus, the state has

a maximum period of eighteen months in which it may attempt to restore the defendant's competency to stand trial.

As we noted in *Garcia I*, § 54-56d offers no guidance as to the effect that an interlocutory appeal taken by a defendant to challenge a trial court's medication order has upon the running of this time period. *Garcia I*, supra, 233 Conn. 92. Therefore, in order to prevent a defendant from effectively escaping a trial court's medication order by taking an appeal, which could consume the eighteen month period, we held that the filing of an interlocutory appeal by a defendant automatically stays or tolls the running of the time period. Id.

Pursuant to Practice Book § 4183, this court may "on its own motion or upon motion of any party . . . order a stay of any proceedings ancillary to a case on appeal." Moreover, this court has statutory authority, pursuant to General Statutes § 52-265 (a) (2), to "fashion a remand that is reasonably necessary or appropriate to facilitate its judgment." *National Elevator Industry Pension, Welfare & Educational Funds* v. *Scrivani*, 229 Conn. 817, 822, 644 A.2d 327 (1994). Without such a stay, the defendant could escape the practical effect of this court's judgment by simply taking an appeal from an order requiring medication. Such a stay, therefore, is reasonably necessary and appropriate to facilitate our judgment. Consequently, we hold that this court is authorized to toll the statutory period during the time of appeal so as to effectuate the purpose of § 54-56d.

In this case, the defendant was initially committed on September 23, 1993, after having been found to be incompetent to stand trial. On this date, the eighteen month statutory period began to run. On January 11, 1994, the trial court heard evidence regarding whether the defendant should be involuntarily medicated, after which it entered an order to medicate the defendant,

but stayed the order, thereby allowing the defendant the opportunity to present argument contesting the order. On January 20, 1994, the court again stayed the medication order pending further argument regarding the defendant's due process rights. On August 10, 1994, the court reissued its order authorizing the medication of the defendant, but stayed that order for twenty days. On August 26, 1994, the defendant filed an appeal in the Appellate Court challenging the medication order. The appeal was subsequently transferred to this court, pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). On May 9, 1995, we rendered our decision and held that the eighteen month time period would recommence at the expiration of the ten day period in which a party may file a motion to reargue before this court. *Garcia I*, supra, 233 Conn. 92. Thereafter, on July 24, 1995, the trial court reheard evidence and issued an order to medicate. On August 2, 1995, the defendant filed the present interlocutory appeal.

Section 54-56d was designed to provide the state with a certain period of time in which to restore a defendant's competency. To implement the statutory policy in the circumstances of this case, the running of the statutory period shall be tolled (1) from August 26, 1994, to May 20, 1995, and (2) from August 2, 1995, to ten days after this decision is released.

## II

Regarding the merits of the forced medication order, the defendant challenges the sufficiency of evidence with respect to only the first and fourth factors enumerated in *Garcia I*—that is: (1) "to a reasonable degree of medical certainty, involuntary medication of the defendant will render him competent to stand trial"; and (2) "the proposed drug regimen will not cause an unreasonable risk to the defendant's health." *Garcia I*, supra, 233 Conn. 84–85.

As a result of the rehearing, the trial court had the benefit of testimony from four medical experts and the defendant's medical guardian. On January 11, 1994, during the initial hearing, the trial court heard testimony from Timothy Schumacher, a clinical psychologist at Whiting Forensic Institute and a member of the defendant's treatment team. Schumacher testified that the defendant lacked the capacity to assist in his own defense, but that there was a "substantial probability" that the defendant could be restored to competency if he were medicated. Additionally, Schumacher testified that "special precautions would be taken so that the risk [of any side effects] would be minimized."

The defendant offered the testimony of Kenneth Selig, a forensic psychiatrist experienced in both the administration of antipsychotic medication and the evaluation of competency. In Selig's opinion, the defendant's condition was consistent with either organic brain damage or a psychiatric disorder. According to Selig, if the defendant's incompetency was a result of organic brain damage, administration of antipsychotic medication would be futile. If, however, the defendant suffers from a paranoid disorder, administration of antipsychotic medication would be the best form of treatment for restoring his competency. According to Selig, approximately one third of the individuals treated with antipsychotic medication experience an improvement in their condition, while one third experience a deterioration in their condition. Additionally, Selig expressed concern regarding the possible side effects of antipsychotic medications: blurred vision; dry mouth; urinary retention; severe movement problems; tardive dyskinesia; neuroleptic malignant syndrome; and a 1 percent chance of fatality.

Next, the trial court heard testimony from Earl Biassey, the defendant's treating psychiatrist. Because the defendant has no memory deficit, no loss of concentra-

tion and no attention deficit, Biassey expressed the opinion that his psychosis is not organic in nature. Nevertheless, Biassey testified that, even if the defendant's psychosis is organic in nature, treatment with antipsychotic medication could lessen the defendant's sense of confusion. In contrast to Selig's testimony, Biassey also opined that "somewhere between 75 and 78 percent" of patients with psychotic disorders respond positively to medication. Biassey concluded that there is a "high percentage of possibility" that the defendant could be restored to competency through medication. Biassey testified that on a few occasions, the defendant had consented to being medicated, and in those instances, the defendant had become more communicative and had experienced no harmful side effects. Moreover, Biassey further testified that serious side effects rarely occur and that, if medicated, the defendant would be closely monitored for any such side effects. At the July, 1995 rehearing, Biassey reaffirmed his opinions and conclusions.

J. Leslie Kurt, an assistant clinical professor at the Yale University School of Medicine specializing in the treatment of patients with mental illness and substance abuse disorders, also testified at the rehearing. Kurt, in concurrence with Biassey's opinion, testified that there was no clinical evidence that the defendant suffered any organic brain damage. Also in accord with Biassey, Kurt testified that, in her opinion, two thirds of the persons who are treated with antipsychotic medication derive some benefit from the treatment. Kurt stated that the side effects of such treatment are generally not serious and that there is a "substantial probability" that the defendant's condition would improve significantly with the administration of medication.

Finally, at the rehearing, the trial court heard testimony from Hollace Brooks, the court-appointed medical guardian for the defendant. After reviewing the

defendant's medical records and the transcripts of the previous hearing, and after speaking with Biassey, Selig and Kurt, Brooks testified that, in her opinion, it is in the defendant's "best medical interest to be involuntarily medicated because the possible benefits of the medication substantially outweigh the possible side effects."

With this testimony before it, the trial court found that the state had met its burden of demonstrating by clear and convincing evidence that each of the five criteria set forth in *Garcia I* had been satisfied. We agree. The trial court's factual findings are not clearly erroneous. As the trial court noted, all the experts, including Selig, agreed "that if the defendant [was] ever to be restored to competency the administration of antipsychotic medication would be the best approach." Schumacher, Biassey and Kurt all opined that not only is there a substantial probability that the defendant's competency could be restored if he were medicated, but also that the medication did not pose an unreasonable risk to the defendant's health. Therefore, there is sufficient evidence to support the trial court's decision.

The trial court's order to medicate the defendant involuntarily is affirmed and the running of the statutory period is tolled for the duration of this appeal and the appeal in *Garcia I.*