## STATE OF CONNECTICUT *v.* EARL JACOBS
### (AC 20485)

Mihalakos, Bishop and Dupont, Js.

Argued January 14—officially released June 25, 2002

*Annacarina DelMastro*, assistant public defender, with whom, in the brief, was *Monte P. Radler*, public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Roslyn Fleisher*, senior assistant state's attorney, for the appellee (state).

DUPONT, J. The defendant, Earl Jacobs, appeals from the trial court's judgment, after a pretrial hearing, that the defendant should be involuntarily medicated to render him competent to stand trial.[1] The defendant argues that the court improperly refused (1) to appoint a guardian ad litem for him prior to the hearing and (2) to grant a continuance for time to obtain the defendant's out-of-state medical and psychiatric records. The defendant also argues that even if we conclude that the court acted properly as to the denial of the appointment and the continuance, the court's judgment should be reversed because forced medication in this case would violate the defendant's rights under the first, sixth and fourteenth amendments to the United States constitution, and because the court did not apply a strict scrutiny analysis of the evidence submitted to determine the need to medicate the defendant.

The following facts and procedural history are relevant to this appeal. According to the police report, at approximately 6 a.m. on April 17, 1999, Officer Scott Sudora of the Fairfield police department was informed that a male carrying a large bag was walking along the Metro North railroad tracks near a specific location. Sudora found a male in the specified location, matching the description, who was later identified as the defendant.

---

[1] This court has jurisdiction, although the appeal is interlocutory, because the defendant's claimed constitutional right to be free from being involuntarily medicated, once infringed, can never be restored. *United States* v. *Brandon*, 158 F.3d 947, 951 (6th Cir. 1998); *State* v. *Garcia*, 233 Conn. 44, 65–66, 658 A.2d 947 (1995). The claim is reviewable because the order so concludes the defendant's rights that further proceedings cannot affect those rights. *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). In fact, the failure to appeal immediately from an order of involuntary medication to restore competency will foreclose review after the trial has concluded. *State* v. *Lisevick*, 65 Conn. App. 493, 497–98, 783 A.2d 73, cert. denied, 258 Conn. 933, 785 A.2d 230 (2001).

The railroad tracks are fenced off in many areas and posted with no trespassing signs. According to Sudora, many criminal suspects try to elude the police in this area and use the area to travel unnoticed. Sudora approached the defendant and ordered him to stop, but the defendant continued to walk and then turned toward the officer and stated: "Fuck you, you red cracker. Leave me alone."

Sudora ordered the defendant to stop a second time, but the defendant began to run up an embankment. Sudora grabbed the defendant's coat at the shoulder, and the defendant yelled, "I'll kill you, motherfucker." The defendant then turned away and pulled a large yellow plastic bag off his shoulder. The defendant attempted to reach into the bag, and Sudora grabbed his arm. The defendant then swung the bag at Sudora and hit him in the upper left side of his forehead with a heavy solid object contained in the bag. The defendant also reached his hand into his belt, pulled out a small object and hit Sudora in the right forearm with the object. Sudora ordered the defendant to drop the weapon, but the defendant did not comply. Sudora then sprayed the defendant in the face with Mace and again ordered the defendant to drop his weapon. The defendant got up and began to run away. Sudora tackled the defendant and again sprayed him in the face with Mace. The defendant swung the metal object, which was later found to be a clothes hanger shaped as a weapon, at Sudora, striking him two times in the chest area. Sudora and Detective Josh Zabin, who had responded to Sudora's call for assistance, then tackled the defendant and the defendant dropped the metal object. The officers handcuffed the defendant.

While being transported to the police headquarters and during his booking, the defendant was extremely violent and several times threatened to retrieve a pistol and shoot Sudora. A videotape of the booking process

was made. The defendant refused to sign the fingerprint card and refused to sign a form after being read his *Miranda*[2] rights. Among the defendant's belongings was a machete with a fifteen inch, sharpened blade, which the defendant had tried to pull out of the yellow bag during the struggle with Sudora.

The defendant was arrested for simple trespass in violation of General Statutes § 53a-110a, breach of the peace in violation of General Statutes § 53a-181, assault of a peace officer in violation of General Statutes (Rev. to 1999) § 53a-167c, interfering with an officer in violation of General Statutes § 53a-167a and carrying a dangerous weapon in violation of General Statutes § 53-206 (a).

On April 18, 1999, the day after the defendant's arrest, Sudora spoke with Mildred Merchant, the defendant's sister. Merchant stated that the defendant has numerous mental problems, but she was not aware of his exact diagnosis and what medications the defendant takes. Merchant stated that the defendant had received most of his treatment while previously incarcerated and that he is prone to extreme violence and would use physical violence to get something that he wanted. Merchant also stated that the defendant "must be evaluated to prevent him from hurting someone else."

The public defender's office was appointed to represent the defendant. Pursuant to the defendant's motion, on May 20, 1999, the court ordered a competency hearing in accordance with General Statutes § 54-56d (c) and (d).[3] At that time, the defendant refused to sign

---

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] General Statutes § 54-56d (c) is entitled "Request for examination," and provides: "If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

General Statutes § 54-56d (d) provides in relevant part: "If the court finds that the request for an examination is justified and that, in accordance with

consent forms that would release information pertinent to his medical history.

On June 9, 1999, the court found the defendant not competent to stand trial and remanded him to the custody of the department of mental health and addiction services for inpatient services in an attempt to restore the defendant to competency. The defendant has consistently refused to cooperate with his attorney and health care personnel.[4]

On July 27, 1999, the Connecticut Valley Hospital issued a competency to stand trial report, which stated: "It is the unanimous opinion of the restoration monitor and treatment team at Connecticut Valley Hospital that at the time of this evaluation, [the defendant] was not able to understand the charges pending against him, nor was he able to understand the courtroom proceedings, nor to assist in his own defense. Further, it is our opinion that there is a substantial probability that [the defendant] could be restored to competency if treated with medication." The report diagnosed the defendant as having continuous, paranoid schizophrenia.

On August 3, 1999, the state moved to have a mental health guardian appointed pursuant to General Statutes § 54-56d (k)[5] to determine whether it was in the defen-

procedures established by the judges of the Superior Court, there is probable cause to believe that the defendant has committed the crime for which he is charged, the court shall order an examination of the defendant as to his competency. . . ."

[4] The defendant's attorney has stated that "essentially there is [no] attorney-client relationship between myself and [the defendant] for the reason that he will not acknowledge me as his attorney." In addition, the defendant also suffers from high blood pressure and refuses to take any medication to control that condition and in fact, does not allow the health care personnel to take a blood pressure reading.

[5] General Statutes § 54-56d (k) (3) provides in relevant part: "If the court finds that the defendant is unable to provide consent for the administration of psychiatric medication, and prior to deciding whether to order the involuntary medication of the defendant under subdivision (2) of this subsection, the court shall appoint a licensed health care provider with specialized

dant's medical interests to be forcibly medicated to restore his competency to stand trial. On August 4, 1999, the court granted that motion and appointed Susan E. Devine, a registered nurse with a master of science degree in nursing, as health care guardian of the defendant. Devine reviewed the defendant's medical history, records and reports, and interviewed the defendant, Merchant and members of the defendant's treatment team.

On October 18, 1999, Devine prepared a report that stated: "I recommend that it is in the actual best medical interests of [the defendant] to receive psychiatric medication (involuntary if necessary) at this time." On October 21, 1999, the defendant's attorney received Devine's report. The defendant's attorney hired a private psychiatrist, Kenneth Selig, as a consultant.

On November 17, 1999, the court signed an order permitting Selig access to the defendant's medical records. On January 18, 2000, the division of forensic services, department of mental health and addiction services, Connecticut Valley Hospital, issued a report that outlined the defendant's behavior since June 9, 1999, when he was admitted to the hospital. The report concluded that the defendant "remains not competent to stand trial. The main obstacle preventing [the defendant] from being restored to competence is his refusal to comply with the treatment team's request that he take psychotropic medication. . . . All less intrusive means to restore [the defendant] to competence have been tried and have not been successful in restoring the defendant." The report also outlined a recommended medication plan if the court ordered such a procedure. If, however, the court found that the defendant could not attain competency, the treatment team recom-

training in the treatment of persons with psychiatric disabilities to represent the health care interests of the defendant before the court. . . ."

mended that the defendant be placed in the custody of the commissioner of the department of mental health and addiction services so that they could pursue a civil commitment. See General Statutes § 54-56d (m).[6]

On January 25, 2000, counsel for the defendant filed a motion for protective action, which asked the court to appoint a guardian ad litem for the defendant. On January 26, 2000, the court denied the motion for protective action and commenced a hearing pursuant to § 54-56d (k) (3)[7] to determine whether the defendant should be forcibly medicated to attempt to restore him to competency. On January 27, 2000, counsel for the defendant orally moved for a continuance to allow the health care guardian[8] an opportunity to obtain psychiatric and medical records that were believed to exist from a time the defendant had spent in Georgia. The court denied that motion and on January 27, 2000, ruled that the state had met its burden of proof pursuant to § 54-56d (k) (2)[9] and ordered the defendant to be forcibly medicated to restore competency to stand trial.

---

[6] General Statutes § 54-56d (m) provides in relevant part: "If at any time the court determines that there is not a substantial probability that the defendant will attain competency within the period of treatment allowed by this section, or if at the end of that period the court finds that the defendant is still not competent, the court shall either release the defendant from custody or order the defendant placed in the custody of the Commissioner of Mental Health and Addiction Services, the Commissioner of Children and Families or the Commissioner of Mental Retardation. The commissioner given custody or his designee shall then apply for civil commitment . . . ."

[7] General Statutes § 54-56d (k) (3) provides in relevant part: "The court shall hold a hearing on [whether to order the involuntary medication of the defendant] . . . and shall, in deciding whether to order the involuntary medication of the defendant, take into account . . . [the] opinion [of the licensed health care provider appointed by the court] concerning the health care interests of the defendant."

[8] The terms health care guardian and licensed health care provider are used interchangeably in this opinion. "Licensed health care provider" is the term used in § 54-56d (k).

[9] General Statutes § 54-56d (k) (2) provides: "If the court finds that the defendant will not attain competency within the remainder of the period covered by the placement order absent administration of psychiatric medica-

A number of cases have considered whether forcible medication to restore or attain competency to stand trial would deprive a defendant of a constitutional right, usually the procedural or substantive due process guaranteed by the fourteenth amendment to the United States constitution. The question requires a consideration of three principles that converge and sometimes collide in the determination of the answer. These principles are that (1) an incompetent defendant cannot be put to trial; see *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *Dusky* v. *United States*, 362 U.S. 402, 402–403, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960); General Statutes § 54-56d (a); (2) a defendant has a constitutional interest in being free from unwanted medical treatment; *Washington* v. *Harper*, 494 U.S. 210, 221–22, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990); and (3) the criminal justice system requires the incapacitation of dangerous offenders and the assurance to the public that criminal offenses incur consequences with the necessity of a public trial. *United States* v. *Weston*, 255 F.3d 873, 882 (D.C. Cir. 2001).

The first principle needs little discussion. All of the cases of which we are aware agree, as immutable, that a defendant who is incompetent cannot be put to trial. Although the conclusion of a court as to whether a person is incompetent may vary based on the particular

tion for which the defendant is unwilling or unable to provide consent, and after any hearing held pursuant to subdivision (3) of this subsection, it may order the involuntary medication of the defendant if it finds by clear and convincing evidence that: (A) To a reasonable degree of medical certainty involuntary medication of the defendant will render him competent to stand trial, (B) an adjudication of guilt or innocence cannot be had using less intrusive means, (C) the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests, (D) the proposed drug regime will not cause an unnecessary risk to the defendant's health and (E) the seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination."

evidence, the principle is well established and is codified in § 54-56d (a) and (b).[10]

The second principle involves the freedom to reject medication that a person does not want to take. The United States Supreme Court has frequently stated that no liberty interest is more sacred than the right of every individual to be in possession and control of his own person, unless clear and unquestionable authority of law dictates otherwise. *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 269, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990). This right is the most comprehensive of rights and most treasured by civilized persons; *Whalen* v. *Roe*, 429 U.S. 589, 599 n.25, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977); and it includes unwanted administration of antipsychotic drugs. *Washington* v. *Harper*, supra, 494 U.S. 221–23. This principle is not immutable, and the various relevant cases discuss when exceptions to the principle apply. The due process and liberty interest in avoiding unwanted antipsychotic medication may be "significant, but it is not absolute." (Internal quotation marks omitted.) *United States* v. *Weston*, supra, 255 F.3d 876.

The third principle recognizes that the state's interests in preventing and punishing criminality are essential governmental policies. In some instances, the state's interest outweighs the individual's interest in remaining free from unwanted medical treatment. "This interest [of the state] lies not just in incapacitating dangerous

---

[10] General Statutes § 54-56d (a) provides: "A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense."

General Statutes § 54-56d (b) provides: "A defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry."

criminals, but also in demonstrating that transgressions of society's prohibitions will be met with an appropriate response by punishing offenders." Id., 880.

The existence of two of these principles, the right of the public to believe that criminals will be punished and the right of a defendant to resist forcible medication often collide when the standards of review and the burdens of proof to be applied differ. The determination of which right becomes supreme in cases involving involuntary medication for the restoration of competency is the ultimate issue in this case. Against the backdrop of these principles and the facts of this case, we address the specific issues raised by the defendant.

I

## THE DEFENDANT'S MOTION FOR PROTECTIVE ACTION

Prior to the hearing required by § 54-56d (k) (3) to determine whether the court should order the involuntary medication of the defendant, the defendant filed a motion for a protective order seeking the appointment of a guardian ad litem. In support of that motion, the defendant's counsel argued that the guardian was needed to obtain the defendant's out-of-state psychiatric and medical records. An independent psychiatrist, retained on behalf of the defendant, told counsel that he could not render an expert opinion as to the necessity and usefulness of the involuntary medication without those medical records. Counsel had tried, but failed to obtain them, although she alleged that such a guardian could obtain them. The defendant's counsel also argued that the defendant did not want an attorney-client relationship with her[11] and that a guardian ad litem was

---

[11] The defendant's counsel did not file a motion to withdraw as the defendant's attorney. Given the facts in the record, it is unlikely that a different attorney would have been more successful in obtaining the defendant's cooperation.

necessary to determine if an appeal should be taken from an adverse order of the court following the hearing.

The court denied the motion because the mental health guardian previously appointed by the court was statutorily entrusted with protecting the medical interests of the defendant and any legal decision as to whether to appeal was not yet ripe. The court also noted that the statutory scheme of § 54-56d did not provide for the appointment of anyone in addition to counsel and the health care guardian, and that the hearing did not concern the future prosecution or trial of the defendant.

We rely on *State* v. *Garcia*, 233 Conn. 44, 658 A.2d 947 (1995) (*Garcia I*), for guidance in resolving this issue. The legislature enacted § 54-56d (k) (2) and (3) in response to and approval of *Garcia I*. Subsection (3) provides in relevant part that the court "shall appoint a licensed health care provider with specialized training in the treatment of persons with psychiatric disabilities to represent the health care interests of the defendant before the court. . . ."[12] General Statutes § 54-56d (k) (3).

We also look to other cases to determine the distinction between the role of an attorney and that of a guardian ad litem. In some instances, the same person serves as both attorney and guardian ad litem; *In re Shaquanna M.*, 61 Conn. App. 592, 594, 767 A.2d 155 (2001); in other cases, two different persons serve. Id., 607 n.15. The two roles are different, however. An attorney for an incompetent person listens to the wishes of the incompetent and acts as a lawyer would in any other case, arguing, briefing, and presenting and cross-exam-

---

[12] There is no claim in this case that the health care guardian lacked specialized training or was otherwise ineligible for appointment.

ining witnesses, whereas a guardian ad litem does what is in the best legal interest of the defendant. See id., 607.

In this case, the incompetent defendant refused to give his permission to be medicated voluntarily. His counsel, who has vigorously represented him, should have and did argue that he should not be involuntarily medicated. She has claimed, among other things, that the defendant has an interest in remaining incompetent. The *Garcia I* court recognized that "it may be in the legal interest of a defendant not to stand trial and, therefore, it would be to his legal benefit to remain incompetent. Such a position, however, if sustained by the court, might result in the defendant being discharged after eighteen months, but in a continued and continuous psychotic state. Thus, although his legal interests would have been vindicated, arguably his medical interest in living a nonpsychotic life would have been overridden." *State* v. *Garcia*, supra, 233 Conn. 90.

The defendant's health care guardian, who was appointed to represent the defendant's best medical interests, should have, and did, assess the defendant's health interests and concluded that it was in "the actual best medical interests of [the defendant] to receive psychiatric medication [involuntarily if necessary] at this time." In *Garcia I*, the court recognized that a defendant who is incompetent to stand trial, in most circumstances, will also be incompetent to make health care decisions and be unable to assist legal counsel to advocate "for his best medical interests." Id., 89.

Section 54-56d (k) (3) makes it mandatory, in accordance with the precepts of *Garcia I*, to appoint a licensed health care provider to represent the health care interests of the defendant if the court finds that the defendant is unable to provide consent for involuntary medication. The health care guardian appointed to represent the defendant's medical interests does not serve

the traditional role of a guardian ad litem appointed to represent the defendant's best *legal* interests.

In the present case, the defendant had both an attorney and a health care guardian. Nothing in § 54-56d authorizes the appointment of yet another person to represent the defendant's legal interests. The argument made by the defendant's counsel centered on the defendant's enmity toward her, the need for additional counsel to determine whether an appeal should be taken, and the need for additional psychiatric and medical records from out-of-state.

There was no need for additional counsel to decide if an appeal should be taken from the court's judgment, as evidenced by the fact that an appeal *was* taken by the defendant's attorney. The out-of-state records might have been obtained by the health care guardian without the defendant's consent if the defendant's attorney had discussed the need for the records with the health care guardian and had given the guardian names and addresses of hospitals or prisons where the defendant might have received treatment in Georgia sometime in the past, most likely in the 1980s. If a guardian ad litem had been appointed, he or she might not have sought the desired medical records or might not have been given them, even if they were sought, or having obtained them, might have determined that they were not helpful in resolving the issue, or might have concluded that the defendant should consent to medication. See *United States* v. *Weston*, supra, 255 F.3d 887.

The value of the appointment was problematical. In this case, as in *Weston*, whether a guardian ad litem was appointed or not would not, with certainty, affect the outcome of the hearing. See id. The two possible positions a guardian ad litem could take would be to agree that medication should be involuntarily administered or that it should not. Both alternatives were

already represented during the hearing by the defendant's counsel and his health care guardian.

Furthermore, the defendant is not precluded from renewing his motion in the future, before or during trial. The court safeguarded the defendant's procedural due process rights by appointing a health care guardian. Whether to appoint a guardian ad litem in addition to legal counsel and a health care guardian is, on the facts of this case, discretionary.[13] The court properly exercised its discretion and denied the plaintiff's motion for a protective order.

## II

## MOTION FOR CONTINUANCE

In many respects, the defendant's motion for a continuance overlaps his motion for a protective order. The motion for a continuance was premised on the ability and need of the health care guardian to obtain authority from the court to obtain records from a prison and a hospital in Georgia. The defendant's counsel argued that if the records were obtained, she could question the defendant's psychiatric expert as to his opinion about whether the defendant should be forcibly medicated. Further, she argued that the health care guardian could make a more informed decision than without

---

[13] General Statutes § 45a-132 provides in relevant part: "(a) In any proceeding before a court of probate or the Superior Court including the Family Support Magistrate Division, whether acting upon an appeal from probate or otherwise, the judge or magistrate may appoint a guardian ad litem for any minor or incompetent, undetermined or unborn person, or may appoint one guardian ad litem for two or more of such minors or incompetent, undetermined or unborn persons, if it appears to the judge or magistrate that one or more persons as individuals, or as members of a designated class or otherwise, have or may have an interest in the proceedings, and that one or more of them are minors, incompetent persons or persons undetermined or unborn at the time of the proceeding.

(b) The appointment shall not be mandatory, but shall be within the discretion of the judge or magistrate. . . ."

such records. The defendant did not argue specifically that without the records, his constitutional rights would be violated.

The state argued that the continuance was unnecessary because the information sought was stale, presumably from the 1980s, and that the information already available was adequate for a decision. The record reveals that the health care guardian testified that she had adequate information to support her opinion and that the proposed plan of the mental health team was narrowly tailored to protect the defendant's liberty and privacy interests. The defendant's counsel represented that she had been unable to obtain the records, but that she did not give the names and addresses of the prison or hospital to the mental health care guardian. The state argued that the defendant had had at least three months to obtain any out-of-state records and to enlist the support of the health care guardian to obtain them.

The trial court noted that the health care guardian was not an advocate for the state and was appointed to protect the health care interests of the defendant. The court also stated that all of the medical evidence indicated that the treatment proposed was narrowly tailored, was not likely to be detrimental to the defendant's health and would be effective in diminishing the kinds of symptoms suffered by the defendant.[14]

The issue raised by the motion for a continuance was not whether the defendant should be forcibly medicated to attain competency, but whether a continuance was necessary to ensure the defendant's right to procedural due process in that determination. The question we must first resolve, therefore, is whether we should ana-

---

[14] In fact, on one prior occasion, while in the custody of the Connecticut Valley Hospital, the defendant had received Haldol, one of the suggested drugs, with a beneficial result.

lyze the denial of the motion in terms of an abuse of discretion or a deprivation of procedural due process.

The granting or denying of a motion for a continuance is usually discretionary. *State* v. *Brown*, 242 Conn. 445, 451, 700 A.2d 1089 (1997). The state's brief discusses the issue as one of discretion whereas the defendant's brief discusses the issue as one of procedural due process and, in the alternative, as an abuse of discretion. Because the denial here is directly linked to a specific constitutional right under the fourteenth amendment to the United States constitution, we determine that we should review the question de novo as a question of law. See *In re Shaquanna M.*, supra, 61 Conn. App. 600–605.

Where the denial of a continuance is directly linked to an irrevocable act, with a constitutional basis, such as the involuntary medication of a person or the termination of parental rights, discretion is not the proper analytical test. See id. In this case, the denial of the continuance concerned the constitutional right of the defendant to be free of involuntary medication. On the particular facts, however, the denial did not pose a risk of an erroneous deprivation of that right in light of the expert testimony and the procedural safeguards that had been followed.[15] Furthermore, the government's interest in not further delaying the outcome of the hearing was substantial. See *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).[16] We conclude that the denial of the motion for a continuance was proper in this case.

III

THE HEARING

Before reaching the merits of whether the court's order of forced medication should be affirmed or

---

[15] The procedural safeguards as outlined in *State* v. *Garcia*, supra, 233 Conn. 93–94, and General Statutes § 54-56d (k) (2) are discussed in part III of this opinion.

[16] We realize that *Mathews* is a termination of parental rights case, but its test for whether procedural due process has been violated is analogous.

reversed, we must first discuss the parameters of that review. The state would limit the review to the issue of whether the fourteenth amendment to the United States constitution was violated, whereas the defendant seeks a review under the first, sixth and fourteenth amendments to the United States constitution. We conclude that the broader review sought by the defendant is proper.

The state claims that the defendant did not raise claims of a deprivation of his first and sixth amendment rights during the trial and is now precluded from raising them under the first prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because of the lack of an adequate record for review. The record, according to the state, is inadequate because there is no factual predicate for a determination of whether those rights were violated. In addition, the state argues that the second prong, a claim of constitutional magnitude alleging the violation of a fundamental right, is lacking. These two claims overlap and will be discussed together. The state also argues that a *Golding* review is "not ripe" because such review is permissible only after a trial, as opposed to after an interlocutory order, because *Golding*'s third prong considers whether the defendant was deprived of a fair *trial.*[17]

The defendant claims that his first and sixth amendment concerns are subsumed in his fourteenth amendment claims because the right to a fair trial is a fundamental liberty guaranteed by the fourteenth

---

[17] We do not read *Golding* so narrowly. If there is a constitutional question to be resolved and a record sufficient for review, the claim can be reviewed, even though raised in an interlocutory appeal. If the state were correct, a defendant could never avail himself of a *Golding*-type review in an interlocutory appeal, no matter how egregious the record shows the unpreserved constitutional deprivation to be. See *State* v. *Lisevick*, 65 Conn. App. 493, 498–99, 783 A.2d 73, cert. denied, 258 Conn. 933, 785 A.2d 230 (2001).

amendment. In *Riggins* v. *Nevada*, 504 U.S. 127, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992), the United States Supreme Court granted certiorari "to decide whether forced administration of antipsychotic medication during trial violated rights guaranteed by the Sixth and Fourteenth Amendments"; id., 132–33; although the defendant had not specifically relied on the sixth amendment in seeking review. Id., 152–53 (Thomas, J., dissenting). The court discussed the evidence presented at the defendant's hearing to terminate the forced medication of drugs in terms of the effect of the medication on the defendant's demeanor (sixth amendment) and on his thought processes (first amendment). The court concluded that "[i]t is clearly possible that such side effects [of the drug] had an impact upon not just [the defendant's] outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." Id., 137. The ability to follow the proceedings and to communicate with counsel relate directly to competency to stand trial.

In this case, the trial of the defendant has not yet occurred, and the claims of the defendant relate to probable future constitutional violations.[18] The record is sufficient for review of these claims. In all cases involving the issues raised here, where the trial has not yet taken place, an actual constitutional violation relating to the future trial is not involved. The question, therefore, is not whether the defendant's rights to a fair trial were in fact violated. Instead, the question is whether, on the basis of the evidence presented at the hearing prior to trial, it has been shown clearly and convincingly

---

[18] A trial court may have to reconsider the defendant's rights after the administration of the medication. See *United States* v. *Gomes*, 289 F.3d 71, 82 (2d Cir. 2002); *United States* v. *Sell*, 282 F.3d 560, 572 (8th Cir. 2002).

that the involuntary administration of the medication, ordered after the factors of § 54-56d (k) (2) have been met, will render the defendant able to understand the charges against him and to assist his counsel in defense of the charges. The answer necessarily includes a determination to a reasonable degree of medical certainty that involuntary medication will render the defendant competent to stand trial, which in turn rests on the expert testimony relating to the probable effect on the demeanor (sixth amendment) and the thought processes (first amendment) of the defendant during a future trial. The inquiry "entails a predictive judgment about the probable efficacy" of the drug treatment to allow the defendant to participate meaningfully in his trial and to assist his counsel. *United States* v. *Weston,* supra, 255 F.3d 882.

Contrary to a case in which *Golding* review is sought after a trial has concluded, where there is a lack of facts or a record on which to conduct a review; see *State* v. *Daniels,* 248 Conn. 64, 80–81, 726 A.2d 520 (1999); *State* v. *Medina,* 228 Conn. 281, 299–302, 636 A.2d 351 (1994); this interlocutory appeal does not rest on predicate findings relative to a specific constitutional deprivation during trial. It rests, instead, on probabilities that specific constitutional deprivations may occur, as established by expert testimony and by the defendant's mental health guardian. We conclude that those specific constitutional probabilities are sufficient for a *Golding* review.[19]

---

[19] Even if a *Golding* review were not available, the defendant is entitled to a review based on the plain error doctrine. The defendant's ultimate and final claim on which he seeks vindication is that the court should not have ordered forced medication. That claim requires an analysis of § 54-56d (k) (2), which is a question of law, and a review might result in a reversal of a miscarriage of justice and is in the interests of the public welfare and of preventing an injustice. See *State* v. *Velasco,* 253 Conn. 210, 218 n.9, 751 A.2d 800 (2000); *State* v. *Trotter,* 69 Conn. App. 1, 11–12, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002). A court may reverse or modify a decision of the trial court that is erroneous in law even if it was not raised in the trial court if reasons of policy require reversal or rectification. Practice Book § 60-5.

For at least the past twenty years, courts have been wrestling with questions relating to the constitutional protections due incarcerated persons to protect them from the involuntary application of antipsychotic drugs, and the conditions and medical safeguards under which such medication can occur, if at all. The subject of whether to medicate involuntarily to cure incompetence is one of relative novelty for both the law and medicine. *State* v. *Garcia*, supra, 233 Conn. 68.

From *Youngberg* v. *Romeo*, 457 U.S. 307, 315, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), to *United States* v. *Sell*, 282 F.3d 560 (8th Cir. 2002), courts have consistently held that persons incarcerated by the state have protection under various amendments to the United States constitution against involuntary medication, but have not agreed on the extent of such protection. The specific amendments involved are the due process clause of the fourteenth amendment (a privacy or liberty interest), the first amendment (free speech or the right to free thought and communication as it affects the defendant's ability to produce ideas) and the sixth amendment (the impact of the demeanor of the defendant on a fair trial). See *Bee* v. *Greaves*, 744 F.2d 1387, 1392–94 (10th Cir. 1984); see also *Washington* v. *Harper*, supra, 494 U.S. 227; *United States* v. *Brandon*, 158 F.3d 947, 953–54 (6th Cir. 1998).

The cases arise under varying facts. These include situations where the incarcerated person already has been convicted of a crime; *Washington* v. *Harper*, supra, 494 U.S. 213; where the person detained has a mental condition that renders him incompetent to stand trial; *United States* v. *Charters*, 863 F.2d 302, 304 (4th Cir. 1988); *United States* v. *Sell*, supra, 282 F.3d 563; where the questions arise in the context of a civil rights action seeking damages because of the involuntary medication; *Washington* v. *Harper*, supra, 217; *Bee* v. *Greaves*, supra, 744 F.2d 1389; *Woodland* v. *Angus*, 820

F. Sup. 1497 (D. Utah 1993); and where a defendant already made competent to stand trial by the administration of drugs seeks to suspend the drug use during trial. *Riggins* v. *Nevada*, supra, 504 U.S. 129–30. The cases involve charges that range from murder; *United States* v. *Weston*, supra, 255 F.3d 873; *Khiem* v. *United States*, 612 A.2d 160, 162 (D.C. 1992); to the sending of a threatening letter. *United States* v. *Brandon*, supra, 158 F.3d 949.

The leading case in Connecticut, which established the procedural safeguards for a determination of when the forced medication of a pretrial detainee may occur, is *State* v. *Garcia*, supra, 233 Conn. 93–94. Those safeguards have been codified in § 54-56d (k) (2). A court "may order the involuntary medication of the defendant if it finds by clear and convincing evidence" that five conditions have been met.[20] General Statutes § 54-56d (k) (2).

Before discussing whether those conditions were met in this case, we begin by discussing the defendant's claim that the standard of review of the evidence by the trial court should be one of strict scrutiny. The other standards discussed in various cases are heightened scrutiny or reasonableness. Although various courts speak of strict scrutiny review in the context of involuntary medication to restore competency to stand trial, no court has precisely defined it. Some courts attempt to describe it by contrasting other standards of review, such as heightened scrutiny or reasonableness, to show what it is not. For example, it is not one that tests the alleged deprivation for its arbitrariness or capriciousness (the reasonableness standard); see *United States* v. *Weston*, supra, 255 F.3d 880; nor is it one called "heightened scrutiny," which tests the deprivation in terms of whether the medication is necessary to accom-

---

[20] See footnote 9.

plish an essential state policy and, if so, whether that policy overrides the right of a defendant to avoid the antipsychotic medication. Id. In Connecticut, *Garcia I* does not categorize the standard of review.

When the cases speak of the standard of review as "strict" or "heightened" scrutiny, or "reasonable," they are speaking of the procedural due process guarantees that the trial court must follow to protect the substantive due process guarantees that are necessary in making the decision to medicate a pretrial detainee involuntarily. These terms describe the standards that the *trial* court must use in the determination and do not relate to the standard of review that an appellate court uses in determining whether the trial court reached the correct decision. The standard of review in this context relates to the proposed procedural approach at the fact-finding level. See *Khiem* v. *United States*, supra, 612 A.2d 171–72. The question is whether the court "employed the wrong standard of review . . . ." *United States* v. *Sell*, supra, 282 F.3d 567; see *United States* v. *Weston*, supra, 255 F.3d 879–80; *United States* v. *Brandon*, supra, 158 F.3d 951; see also *Washington* v. *Harper*, supra, 494 U.S. 223–24.

After the procedural standard for the conduct of the hearing on whether to medicate forcibly has been established, the appellate court need apply only a clearly erroneous standard when testing the facts necessary to be found by the trial court.[21] *State* v. *Garcia*, 235

[21] In some civil cases, a strict scrutiny test for appellate review is suggested in determining the standard of an appellate court's review of a trial court's findings, instead of a clearly erroneous test. *Grayson* v. *Grayson*, 4 Conn. App. 275, 297, 494 A.2d 576 (1985) (*Borden, J.*, dissenting), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987).

Legislation is sometimes tested by reviewing courts to determine constitutionality by using a strict scrutiny standard or a rational basis standard. If the right is explicitly guaranteed by the federal or state constitution, strict scrutiny is more likely to be the test than if the right is implicitly guaranteed. *Horton* v. *Meskill*, 172 Conn. 615, 640–41, 376 A.2d 359 (1977); see also *Keogh* v. *Bridgeport*, 187 Conn. 53, 66–67, 444 A.2d 225 (1982). The present case does not involve the standard of *appellate* review of legislation, but

Conn. 671, 679, 669 A.2d 573 (1996) (*Garcia II*). *Garcia I* already established the precise conditions or standards that a trial court must use in reviewing the evidence to determine whether to order involuntary medication. Id., 673. *Garcia II* established that appellate review of those conditions is one using the clearly erroneous standard, at least as to the factual findings.[22] Id., 679. Whatever the label given to the standard by which a trial court reviews the medical evidence is of little consequence in Connecticut after the decisions in *Garcia I* and *II*, and we do not need to determine the nomenclature of that standard. The trial court correctly used the standard of the applicable statute in its determination of whether to order forced medication of the defendant.

The trial court found that the five conditions of § 54-56d (k) (2) had been established by clear and convincing evidence and, therefore, ordered that the defendant be medicated involuntarily. Four of the five conditions are factual. On the basis of the medical testimony, the evidence was sufficient to prove, with a reasonable degree of medical certainty, that involuntary medication would render the defendant competent to stand trial, that adjudication of guilt or innocence could not be had using less intrusive means, that the proposed treatment plan was narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests and that the proposed drug regime would not cause an unnecessary risk to the defendant's health. Of necessity, these findings are based on the medical opinion of the psychiatric experts and the health care guardian. The medical opinions in this case clearly and convincingly support these factual conclusions.

---

whether the trial court properly determined that the safeguards of *Garcia I* were present to allow the involuntary medication of the defendant.

[22] *Garcia II* held that the first and fourth factors of *Garcia I* were factual, for which review is the clearly erroneous standard.

During the hearing, the court heard testimony from Paul Amble, a physician and an assistant clinical professor at Yale University, who acted as an independent consultant to the defendant's treatment team at Connecticut Valley Hospital. In Amble's opinion, after consultation with the defendant and the defendant's treatment team at Connecticut Valley Hospital, the defendant remained incompetent to stand trial, but could be restored to competency by treatment with medication. Amble diagnosed the defendant as suffering from schizophrenia, chronic paranoid type. It was also his opinion that the defendant could not be restored to competency within statutory time limits without medication and that all of the efforts at Connecticut Valley Hospital to restore his competency without drugs have been unsuccessful.

Amble believed "to a reasonable degree of medical certainty [that] administration of [psychotrophic] medication would alleviate [the defendant's] symptoms sufficiently so that he would be able to understand rationally the charges against him and be able to participate in his own defense." The physician outlined three specific options for treatment, all of which were familiar to the defendant's treatment team, and stated that the proposed treatment plan is "narrowly tailored" to minimize intrusion on his liberty and privacy interests. The treatment team would administer the medications for a six week period and then give an assessment to the court as to his ability to proceed with trial. At the time of Amble's testimony, the defendant had been at Connecticut Valley Hospital in excess of six months. His behavior has remained about the same. In Amble's opinion, taking the medications would improve the defendant's rational understanding of the charges and have no negative impact on his ability to recall past events.

The only condition of § 54-56d (k) (2) that must be satisfied, which is not strictly factual, is that "the seri-

ousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination." General Statutes § 54-56d (k) (2) (E). This condition relates to the balancing test discussed by many courts, and to the facts comprising the particular crime committed, which is a mixed question of law and fact. This is because its determination rests, in part, on what the law determines is a "serious" crime based on the particular facts, and what case law establishes as the state's interest in bringing the defendant to trial. This factor requires a plenary review of the trial court's determination. See *Milner* v. *Commissioner of Correction*, 63 Conn. App. 726, 736, 779 A.2d 156 (2001).

The crimes with which the defendant is charged are serious in terms of the punishment, which is one test for determining seriousness. The combined possible maximum punishment for assault on a police officer, interfering with a police officer and carrying a dangerous weapon is fourteen years. According to Ballentine's Law Dictionary, "serious" is defined as "[i]mportant" or "weighty." Ballentine's Law Dictionary (3d Ed. 1969). Two of these crimes would be considered felonies.[23]

---

[23] Assault of a peace officer is a class C felony according to § 53a-167c (b). The penalty for a class C felony is "a term not less than one year nor more than ten years . . . ." General Statutes § 53a-35a (6). Carrying a dangerous weapon is an unclassified crime that carries a maximum penalty of a fine "not more than five hundred dollars or [imprisonment] not more than three years or both. . . ." General Statutes § 53-206 (a). Interfering with an officer is a class A misdemeanor. See General Statutes § 53a-167a (b). The penalty for a class A misdemeanor is "a term not to exceed one year . . . ." General Statutes § 53a-36 (1).

In addition, the defendant was charged with breach of the peace and simple trespass. Under the facts of this case, breach of the peace is a class B misdemeanor. See General Statutes § 53a-181 (b). The penalty for a class B misdemeanor is "a term not to exceed six months . . . ." General Statutes § 53a-36 (2). Simple trespass is an infraction and the penalty would be a fine. See General Statutes § 53a-110a.

The state must "prove that the seriousness of the alleged crime is such that its interests in bringing the defendant to trial are of great enough magnitude to warrant . . . a compromise of the defendant's interests." *State* v. *Garcia,* supra, 233 Conn. 85–86 n.31. In other words, the state must prove that its interests in prosecuting the matter due to its seriousness is sufficient to outweigh the defendant's substantive due process rights not to be involuntarily medicated. If the crime is minor, it will be difficult for the state to satisfy the requirement that the intrusion is warranted. All defendants share an equal substantive due process right in not being forcibly medicated, but the state's interest in overriding that right will vary depending on the seriousness of the crime with which the defendant is charged.

We have concluded that the defendant's first and sixth amendment rights, as well as his fourteenth amendment rights are involved. The need for balancing the interference with those rights because of the state's interest in fairly and accurately determining if he is guilty of the crimes with which he is charged is a statutory given. The trial court determined that the defendant's interest was superseded.

The direction to the trial court relating to the balancing prong of the *Garcia I* standard for review of the evidence necessary to allow involuntary medication provides that "the state's interest in bringing the defendant to trial can constitute an overriding justification for the involuntary medication of the defendant under certain circumstances." Id., 74. There must be an overriding justification and a determination of medical appropriateness. See *Riggins* v. *Nevada,* supra, 504 U.S. 135. Whether a proposed course of treatment is medically appropriate depends on the judgment of medical professionals. *United States* v. *Weston,* supra, 255 F.3d 876.

In determining the balance between the liberty of the defendant and the need of the state, we recognize that preventing and punishing criminality are essential governmental policies; id., 880; but also recognize that the kind of crime, a less serious one, such as sending a threatening letter; *United States* v. *Brandon,* supra, 158 F.3d 956–57; does not give the government the same compelling interest in adjudication of guilt as do the crimes of murder or assault on a police officer. See *United States* v. *Weston,* supra, 255 F.3d 881.

We agree with the trial court that involuntary medication will serve the government's interest in rendering the defendant competent, while at the same time protecting the defendant to the extent possible. Despite the defendant's significant constitutional interest in refusing antipsychotic medication, in view of the seriousness of the charges and the procedural safeguards of the hearing, we conclude that the government's interest in restoring his competency for trial is paramount. The judgment of the trial court took into account the procedural safeguards of § 54-56d (k) (2) to protect the defendant's substantive due process rights in its determination that the defendant should be forcibly medicated.

The judgment is affirmed.

In this opinion the other judges concurred.